[S. F. No. 21268. In Bank. May 29, 1963.]

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff and Respondent, v. JAMES I. BARNES CONSTRUCTION CO. et al., Defendants and Appellants.

Wallace & Wallace, W. W. Wallace and Allan Wallace for Defendants and Appellants.

Bohnert, Davis & McCarthy, Gerald R. Knecht and Arthur M. Bohnert, Jr., for Plaintiff and Respondent.

PETERS, J.—The basic problem involved on this appeal is whether an admitted assignment of moneys due under a contract was an absolute assignment or was a conditional one for security. If the former, as the trial court determined, the assignee may recover from the debtor of the assignor with notice, upon allegation and proof that the debtor, after notice, paid the assignor. In such event, mere payment by the debtor of the assignor to the assignor, after notice of the assignment, creates the liability. But if the assignment was a conditional one, that is one for security of the assignee, here the insurance company, and, after notice, the debtor of the assignor pays the assignor, the assignee can recover from the debtor of the assignor only if its security has been adversely affected, that is, only if it has suffered a loss. In the security situation, the assignee can recover only for those damages, for that detriment, proximately caused by the breach (Civ. Code, § 3300). For reasons hereafter stated, we are of the opinion that under the evidence the assignment was a conditional one, for security purposes only. The plaintiff pleaded and tried its case, and the trial court decided it, on the theory that the assignment was an absolute one. No damages were alleged or proved to have resulted from a breach of the assignment. Thus the judgment, based on this erroneous interpretation of the relationship of the parties, cannot stand.

The facts are not substantially in dispute. The action was instituted by St. Paul Fire and Marine Insurance Company, hereafter called St. Paul, against James I. Barnes Construction Co., a partnership, hereafter called Barnes, claiming that Barnes, after notice, had improperly paid money to Stewart & Nuss, Inc., hereafter called Stewart, that was due to it under an assignment from Stewart. The trial court decided in favor of St. Paul. Thus, if this judgment stands, Barnes

having already paid Stewart for the work performed, will also be required to pay St. Paul.

The complaint alleged that Barnes was the general contractor for the construction of the Fresno County Hospital; that it entered into a subcontract with Stewart wherein the latter agreed to perform certain portions of that construction for the total price of $52,733.32; that St. Paul executed a surety bond in favor of Barnes, with Stewart as principal, conditioned upon performance by the latter; that Stewart assigned to St. Paul all rights, payments, proceeds and benefits due to it from Barnes in connection with the subcontract; that St. Paul gave Barnes written notice of such assignment, together with instructions to hold all moneys due for the account of St. Paul, and that Barnes acknowledged such notice and agreed not to release any payments otherwise due to Stewart without written authorization from St. Paul; that although St. Paul gave Barnes no such authorization, and the subcontract has been fully completed, Barnes paid Stewart and refuses to pay St. Paul, on demand, any of the sums due under the assignment. It should be noted that St. Paul failed to allege that it suffered any loss by reason of its bond, or by reason of Stewart's manner of performing its subcontract with Barnes. Both by its pleadings and the evidence, it relied entirely upon the proposition that it was an absolute assignee of money due to Stewart, and was unconditionally entitled to payment because Barnes paid the same to Stewart after notice.

Barnes' answer was lengthy, rambling and repetitious. It raised the following legal and factual issues: (1) There was no assignment, for the contract specifically prohibited Stewart from assigning any interest therein without written permission from Barnes, which permission was never sought or given; (2) those facts were known to St. Paul; (3) no notice of an alleged assignment was ever given to Barnes by St. Paul, or by anyone else, and Barnes did not consent to hold funds due Stewart for the account of St. Paul; (4) the notice alleged in the complaint (and relied upon by plaintiff) was predicated upon a statement to the effect that Stewart contemplated involuntary bankruptcy and would be unable to complete the subcontract, and Barnes' reply to St. Paul was predicated upon the assumption that the facts stated were true, whereas St. Paul knew those facts to be untrue; (5) actually, Stewart faithfully performed all portions of the contract

which remained to be performed on the date of the aforementioned correspondence, and Barnes paid Stewart in full according to the terms of the contract; (6) the surety bond which St. Paul issued required it to perform, at its expense, any and all portions of Stewart's contract with Barnes that Stewart failed or was unable to perform; (7) neither Stewart nor Barnes, nor anyone else, at any time called upon St. Paul to perform any services under that contract, or under its bond, or to pay any money to anyone on account of either of those documents; (8) St. Paul paid no consideration for its alleged assignment, paid no money or other consideration on account of the premises, and never became entitled to any payments under the contract or otherwise.

The contract entered into between Barnes and Stewart provided for services to be performed at different stages of the construction project, for a total agreed price of $51,282, which with extras subsequently ordered by the County of Fresno ultimately brought the total price under the subcontract to $52,733.32. Stewart was to be paid monthly on certification of work completed together with sworn statement that all labor and materials had been paid for, provided, however, that 10 per cent of each such installment was to be retained until 30 days after final completion. The contract also provided "that the Sub-contractor shall not sublet, assign or transfer this contract, or any part hereof, without the written consent of the Contractor." In addition, it provided that Stewart furnish a surety performance bond payable to Barnes, in a form satisfactory to the latter, and which "shall be in the sum of [$]51,282.00 to cover faithful performance of the contract, and each and all of its stipulations. . . ." Stewart was to make all arrangements for obtaining such bond, but Barnes was to pay the premium charged therefor. In performance of that condition Stewart obtained, and delivered to Barnes, St. Paul's bond conditioned as provided, and Barnes paid St. Paul the premium charged therefor. St. Paul was chargeable with knowledge of the terms of the Stewart-Barnes contract because the application for the bond (which St. Paul placed in evidence) specifically referred to that contract, and the bond which was issued as a result of that application insured Stewart's faithful performance of that contract. This application for the bond between St. Paul and Stewart contained language of assignment, but there was no evidence that Barnes knew of its existence until St. Paul sent Barnes a copy some five

months later. That application for the bond contained the provision: "For the better protection of the Company, [Stewart agrees] to assign, transfer and convey, and does hereby assign, transfer and convey to . . . [St. Paul] . . . but only in the event of any breach, delay, or default on the part of . . . [Stewart] in the performance of the contract covered by said bond or bonds, failure or inability of . . . [Stewart] to promptly pay, satisfy and discharge any and all obligations which might constitute possible claim under the bond or bonds, or breach of any of the terms of this agreement," all of Stewart's right, title and interest in and to the contract together with all sums due or to become due thereunder.

After delivering the performance bond to Barnes, Stewart commenced work under the contract, and on November 20, 1957, performed and was paid for the portion of the work completed the sum of $14,769.22. On that date St. Paul sent a letter to Barnes, advising the latter that St. Paul held the assignment mentioned above, and enclosing a copy of the application containing the quoted language.[1]  The letter closed with a request "to withhold any and all progress payments and retention due or to become due until such time as you are notified to the contrary by this Company." Barnes acknowledged receipt of that letter on November 22d, with copy to Stewart, advising St. Paul of the amount already paid to Stewart, and asking to be advised by both parties how further payments were to be processed. No reply from either St. Paul or Stewart was received by Barnes. On January 12, 1958, St. Paul's attorneys wrote Barnes. This second letter did not refer to the previous correspondence, but repeated the information contained in St. Paul's letter of November 20th, with the additional statement that St. Paul is "now informed that it is the intention of Stewart & Nuss, Inc. to file a voluntary petition in bankruptcy under chapter 11, title 11 of the United States Code. It is a condition precedent to the filing of such an application that the applicant be either insolvent or unable to meet his debts as they mature."[2]  That letter contained a demand that Barnes "withhold any and all progress

---

[1]This is not the notice alleged in the complaint, which refers to a later notice given on January 22, 1958.

[2]The code section referred to in the letter is now section 723, and refers to "Proceedings for an Arrangement." Under its provisions the debtor may (and evidently in this case did) continue in business under the supervision of the bankruptcy court.

payments or retention monies due or to become due under your subcontract and to hold the same for the account and to the order of St. Paul. . . ." It also contained a promise to further contact Barnes regarding St. Paul's intentions in the premises. On January 20, 1958, Barnes replied, again advising that the sum of $14,769.22 had been paid to Stewart, and stating that "no further monies will be paid on the account of Stewart & Nuss until written authorization from" St. Paul. Barnes received no further word from St. Paul or its attorneys during the period of construction (which continued throughout 1958 and 1959).

On January 13, 1958, Stewart did file a voluntary petition in the federal court requesting proceedings for an arrangement. There was no evidence that Barnes ever received notice of this fact.[3] Although the petition was introduced in evidence, the list of creditors (which was an exhibit thereto) was not, and it is not known whether Barnes, or any of Stewart's suppliers or subcontractors under the Barnes contract, were listed as creditors of Stewart. In any event, no further performance was due from Stewart, under the contract, until late in the year 1958. Thereafter all such work was performed when Barnes' superintendent called upon Stewart to proceed. The contract was fully completed late in 1959. There was a dispute as to whether the work subsequent to January 13, 1958, was performed by Stewart or by its receiver. The only evidence of the latter fact was the testimony of one of Stewart's officers who stated that after the filing of the petition the receiver took over the management of the business, but continued to perform all of Stewart's outstanding obligations. (For Barnes' contention, see footnote 3.) In either event, there was no testimony that either Barnes or Fresno County (the owner) was ever advised that any company other than Stewart was performing the obligation of the contract, until during the period between completion and due date of the final retention payment. Barnes continued to pay Stewart each progress payment as provided in the contract, and there was no testimony of any complaint from the receiver. However, the last payment, made 30 days

---

[3]Barnes' superintendent testified that he was never advised of Stewart's bankruptcy proceedings, and that all of the work to be performed by Stewart was performed by Stewart's men and equipment on his (the superintendent's) calls to Stewart. His testimony is uncontradicted.

after completion and acceptance by the County of Fresno, was by draft made payable jointly to Stewart and the receiver.

At no time during the performance of the contract did any supplier of labor or material, or anyone claiming under Stewart, file a stop order or make claim of any kind on Barnes or on the County of Fresno. Nor did Barnes call upon St. Paul to make any payment on account of Stewart or to perform any act under its bond. However, St. Paul's witnesses did testify that St. Paul was called upon during early 1958 to make (and did make) payment to two of Stewart's subcontractors in the total sum of $851.82. Those payments represented services performed prior to November 1957. The witnesses who so testified were unable to state that St. Paul presented those bills to Stewart for payment before honoring them, or ever advised Barnes of the fact that it had been called upon to make such payments.

The trial court inferentially concluded that the assignment was absolute and unconditional. It found that St. Paul executed the surety bond guaranteeing to Barnes the faithful performance by Stewart of the subcontract; that prior to November 20, 1957, Stewart assigned to St. Paul all moneys due or to become due under that contract; that on November 20, 1957, St. Paul notified Barnes of the assignment and, that Barnes acknowledged receipt of that notice and promised to hold all further proceeds for the benefit of St. Paul; that on that date Stewart was financially unable to pay its suppliers of labor and materials in connection with the Barnes contract, and subsequently, and on January 13, 1958, filed a voluntary petition for an arrangement; that the Stewart contract was thereafter fully performed by Stewart's receiver in bankruptcy; that the sum of $37,964.10 was earned by such performance subsequent to November 20, 1957; that Barnes made no payments to St. Paul in connection with the contract, but did pay Stewart, after notice of the assignment, the sum of $37,964.10 as follows: $30,317.77 on December 29, 1958; $2,373 on May 20, 1959; and $5,273.33 on February 12, 1960. As a conclusion of law the court found that Barnes was indebted to St. Paul in the total sum of $37,964.10, together with interest on the component sums from the dates on which they were paid to Stewart, respectively.

A comparison of the evidence summarized above with the findings clearly indicates that there was not sufficient evidence

to sustain many of the specific findings, and Barnes argues such point at length.[4] Furthermore, the court failed to make any finding (either by inference or otherwise) on the affirmative allegations of Barnes' answer raising such issues as the assignability of the contract and Barnes' alleged excuse for failing to withhold payment after agreeing thereto. Full discussion of the findings is unnecessary, however, for the reason that even if all of the findings were adequately supported and proper in all respects it is clear that they do not sustain the single conclusion of law.

■ The sole question that is controlling (and on which the trial court made neither a specific finding nor an express conclusion) is whether the purported assignment was absolute (and became binding on Stewart and its creditors on or before January 1958), or was a conditional assignment which never became operative. Obviously, St. Paul proceeded (both by its pleadings and by the manner in which it tried the case) on the theory that the assignment was absolute and operative *ab initio,* for it made no attempt to allege or prove that it suffered any financial loss of any kind by reason of any claimed default of Stewart.[5]

Of course, if the assignment was absolute and operative *ab initio,* Barnes would be liable to an assignee from whom it had notice, regardless of any agreement on its part to withhold or to make payment to the assignee. (*H. D. Roosen Co.* v. *Pacific Radio Pub. Co.,* 123 Cal.App. 525 [11 P.2d 873], and *H. S. Mann Corp.* v. *Moody,* 144 Cal.App.2d 310 [301 P.2d 28], holding that such an assignment becomes complete when the debt comes into being.) But while it is true that *Roosen*

---

[4]For example, the finding that Stewart executed an assignment to St. Paul completely ignores the fact that the alleged assignment included language to the effect that it should be operative ''only in the event of any breach, delay, or default'' by Stewart in the performance of its contract with Barnes, and that insofar as Barnes was concerned Stewart faithfully performed. The finding that after January 1958 Stewart's contract was performed by the receiver is not supported by any evidence other than the unsupported statement of a witness who had left the employ of the company before that performance, and whose testimony was objected to and stated by the trial judge to be other than the best evidence. The finding of notice in November 1957 (instead of January 1958) is not consistent with the pleadings.

[5]The payment by St. Paul of $851.82 to two of Stewart's suppliers was offered to prove that in November 1957 (when St. Paul sent its first notice to Barnes) Stewart was unable to pay its creditors. But St. Paul offered no evidence to indicate whether or not it ever recouped that sum from Stewart, and offered no evidence that it ever notified Barnes of these payments.

dealt with a situation wherein the services to be performed by the assignor were completed, after notice of assignment, by the assignor's receiver, neither that case, nor any other cited by St. Paul, deals with the type of assignment with which we are here concerned. Here, the language of the assignment specifically provided that it was made "[f]or the better protection of" the surety company which might be required to, under certain circumstances, fulfill the very obligations of the thing assigned. Thus, the intent of the assignor and the assignee was to create an assignment which would come into being only under certain contingencies. Those contingencies were also set forth in the assignment as those failures and defalcations on the part of the assignor which might cause the assignee to become so obligated. While it is true that St. Paul, when it gave notice of the assignment to Barnes and demanded that future payments be made to its order, may have honestly believed that it was about to become obligated to Barnes for fulfillment of the assignor's contract, that contingency never occurred (except, possibly to the limited extent of $851.82). Although Barnes agreed and consented to such demand, it did so in the belief that the mentioned contingency had occurred or would occur, and in reliance upon St. Paul's statement (made as part of the demand) that it would subsequently contact Barnes in regard to the premises. This it never did. After more than six months elapsed, and it was again time for performance under the original contract, Barnes called upon Stewart to perform, and received complete performance. None of the subsequent obligations of the contract were performed by St. Paul, and it is obvious that Barnes relied upon its continued silence as an indication that all parties had been mistaken when they thought that a conditional assignment had come into being.

The transaction is a relatively simple and common one. The bond was paid for by Barnes to protect it, as general contractor in case Stewart, the subcontractor, defaulted in performance. In the event of such default the insurance company, here St. Paul, would be required to perform. The assignment, an integral part of the whole transaction, was to protect the insurance company if it were required to perform. This it never offered or was called upon to do. In fact, it did not even follow up on its promise to contact and advise Barnes in the premises. It ignored its obligations to

Barnes. Barnes knew that unless St. Paul was called upon to perform Stewart's contract, then (insofar as that contract was concerned) it was parting with no consideration for the alleged assignment.

To interpret the assignment as separate from the bond, and as an absolute one, would be to pervert the transaction from one primarily intended to protect Barnes against non-performance by Stewart, and to protect St. Paul were it required to perform, into a transaction by which Barnes would be compelled to pay twice for performance without allegation or proof that St. Paul ever suffered any detriment at all.

St. Paul attempts to answer this reasoning with the claim that the assignment was not made solely to protect it from loss under the Stewart-Barnes contract, but for its protection from loss on account of any other bond which it wrote for Stewart during the same period. That position is untenable for several reasons. In the first place, it did not plead or offer proof on any such theory. It never advised Barnes that it had ever written any other bonds for Stewart. Moreover, such argument does not answer Barnes' principal contention that if it had been required to withhold and pay to St. Paul any sums to become due under Stewart's contract, it would only be because Stewart was unable to perform, and St. Paul would have become obligated to expend the very money which it received in fulfilling the principal obligation under its contracts with the parties.

For these reasons, the principle of *Roosen, supra,* 123 Cal. App. 525, is not here applicable. That is demonstrated by the case of *Loveland* v. *Peters,* 92 Cal.App.2d 47 [206 P.2d 443]. That case cites (at p. 51) and distinguishes *Roosen.* While the facts of *Loveland* are not on all fours with the situation herein, it clearly demonstrates that the debtor of a purported assignor does not become obligated to honor notice of such assignment if that instrument was intended as security rather than as an outright transfer, and the obligation which it was to secure never came into being.

The facts of this case also come within a well recognized exception to the general rule that after notice of assignment a debtor pays the assignor at his peril. That exception is that, where an assignment of money due or to become due under an executory contract is subject to advances which are necessary to enable the assignor to perform the contract, and the debtor makes such advances, he will be pro-

tected. Thus, in *Fricker* v. *Uddo & Taormina Co.*, 48 Cal.2d 696 [312 P.2d 1085], this court acknowledged the existence of such rule, but was unable to apply it because the assignment was also executed (with debtor's knowledge and consent) for the purpose of obtaining services which enabled the assignor to perform the contract, and the debtor was unable to show that the other payments made for the same purpose had priority. The *Fricker* opinion cites authorities from many other jurisdictions in support of the propriety of the exception. Since the date of the *Fricker* decision it has been held in this state that even though he has received a notice of assignment, the " 'anticipatory debtor may . . . do whatever reasonably appears to be necessary to enable the assignor to perform the contract.' " (*Benton* v. *Hofmann Plastering Co.*, 207 Cal. App.2d 61, 70 [24 Cal.Rptr. 268].)

Although the theory that Barnes' subsequent payments to Stewart were required to enable the latter to perform would not be applicable to any payments made to Stewart after the contract was completely performed, the evidence shows that at least a portion of the payments so made were by draft payable jointly to Stewart and its receiver. The evidence on the subject is unclear, but this fact may indicate that such final payment was not made to Stewart, but to the person or persons who performed the obligation of its contract. And even if those payments were made to Stewart, they were made in consideration of performance which St. Paul would have been required to make if the assignment had been honored in full, and which St. Paul never offered to perform. It can be argued that by its silence during the period in which Stewart (or someone on its behalf) was performing, St. Paul waived its assignment. Its theory (and the judgment which it seeks to sustain) proceeds on the proposition that it may sit by silently while its assured parts with all moneys necessary to prevent any loss under its surety bond, and ultimately (without having suffered loss) require the assured to make double payment for the very performance it guaranteed. Such theory offends fundamental principles of equity.[6] The *Benton* decision, *supra,* denied relief to an assignee who, after giving notice of the assignment, silently acquiesced in a compromise

---

[6]While it may or may not be that fear of equitable determination of the issues motivated St. Paul in limiting its complaint to a simple claim of money due under an absolute assignment, it is quite obvious that the answer of Barnes raised equitable issues.

wherein the debtor paid to third persons moneys which would have otherwise been due under the assignment. (207 Cal.App. 2d at p. 69.)

For these reasons we conclude that: (1) the language of the assignment did not create a present transfer, but only a conditional transfer in the event that it became necessary for St. Paul to pay or perform under its bond; (2) that there remains an unresolved question as to whether that condition ever existed, and as to which the trial court must make findings; (3) that the trial court must also make findings on the issue of whether Barnes was excused (because of either fraud, mutual mistake of fact or St. Paul's subsequent default) from any obligation to St. Paul because of its agreement to withhold payments for St. Paul's account; (4) that there is no finding on the question of whether Barnes' payments after notice were necessary to enable the assignor to complete its contract; (5) that there is no finding on the issue of whether St. Paul suffered any detriment by reason of Barnes' payments to Stewart; (6) that the foregoing matters require a retrial of the action.[7]

The judgment is reversed.

Gibson, C. J., Traynor, J., Schauer, J., Tobriner, J., and Peek, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Salsman in the opinion prepared by him for the District Court of Appeal in *St. Paul Fire & M. Ins. Co.* v. *James I. Barnes Constr. Co.* (Cal.App.) 26 Cal.Rptr. 646.

---

[7]We have purposely refrained from suggesting that a finding should have been made on Barnes' allegation that its contract with Stewart is unassignable for the reason that such allegation is untenable. A provision in a contract against assignment does not preclude assignment of any money due or to become due thereunder (*Trubowitch* v. *Riverbank Canning Co.*, 30 Cal.2d 335, 339 [182 P.2d 182]).