829 F.2d 705
 15 Collier Bankr.Cas.2d 1459, Bankr. L. Rep. P 71,522
In re GOLDEN PLAN OF CALIFORNIA, INC.; State Loan
Servicing, Inc.; Financial Securities Agency,
Inc.; Mid-Central California, Inc., Debtors.
Jesse BEAR, et al., Plaintiffs-Appellants,
v.
Melvyn J. COBEN, Trustee of Golden Plan of California, Inc.,
Defendant- Appellee.
Al FOX, et al., Plaintiffs-Appellants,
v.
Melvyn J. COBEN, Trustee of Golden Plan of California, Inc.,
Defendant- Appellee.
Robert ACKERMAN, et al., Plaintiffs-Appellants,
v.
Melvyn J. COBEN, Trustee of Golden Plan of California, Inc.,
Defendant- Appellee.
 Nos. 85-2669, 85-2670 and 85-2671.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 18, 1986.
Decided Nov. 14, 1986.
Amended December 17, 1986.
Second Amendment March 13, 1987.
 
 Sheppard, Mullin, Richter & Hampton, Richard W. Brunette, Jr., Los Angeles, Cal., for plaintiffs-appellants.
 Eichler Law Corp., Melvyn Coben, Trustee, Sacramento, Cal., and Gendel, Raskoff, Shapiro & Quittner, Herbert Katz, Los Angeles, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before CHOY, Senior Circuit Judge, HUG and WIGGINS, Circuit Judges.
 SECOND AMENDED OPINION
 CHOY, Senior Circuit Judge:
 
 
 1
 This consolidated appeal concerns the claims of certain investors in Golden Plan of California, Inc. ("Golden Plan"), a now bankrupt loan brokerage company. The Bear investors challenge, inter alia, the district court's determination of their rights to a promissory note and trust deed assigned to them by Golden Plan. The Fox investors challenge the imposition upon them of costs and expenses under Bankruptcy Code section 506(c). All the investors in this appeal challenge the district court's determination that advances they received from Golden Plan constituted voidable fraudulent conveyances.
 
 
 2
 We reverse the district court's judgment on these three issues.
 
 BACKGROUND
 
 3
 Golden Plan solicited funds from the general public for the purpose of making real estate loans to borrowers. As lender, Golden Plan often extended loans to financially unstable borrowers with inadequate equity in the underlying real property to secure their obligations. Investors in Golden Plan received whole or partial assignments of notes and trust deeds held by Golden Plan. Golden Plan often retained possession of the assigned instruments, acting as a loan servicing agent by collecting payments from the borrowers and remitting them to the investors. If an assigned obligation went into default, investors who were assigned the obligation could receive "advances" made by Golden Plan on the defaulting borrowers' behalf. These "advances" were paid from accounts in which investors' funds had been commingled with Golden Plan funds.
 
 
 4
 An involuntary petition for Chapter 11 proceedings was filed against Golden Plan in February 1982. Pursuant to a request for special instructions by the bankruptcy trustee, the bankruptcy court issued an order establishing a procedure for releasing to investors the thousands of notes and trust deeds in Golden Plan's custody.
 
 
 5
 The bankruptcy court established four categories of Golden Plan investors: A, B, C, and D. Category A consisted of one or more investors who were original named payees and beneficiaries on the notes and trust deeds, regardless of whether or not they were in possession of the assigned instruments. Category B consisted of one investor who received a 100% interest in a note and trust deed, regardless of possession. Category C consisted of investors who received fractional interests in a note and trust deed and took possession of the assigned instruments. Category D consisted of investors who received fractional interests in a note and trust deed and did not have possession of the instrument assigned to them.
 
 
 6
 The court determined that investors in categories A, B, and C (the "Fox investors") had ownership interests in the instruments while investors in category D (the "Bear investors") held only unperfected security interests.
 
 
 7
 The court then conditioned release of the notes and trust deeds that had been assigned to the Fox investors upon the Fox investors' payment of a $100 administrative fee per loan released and a 4% service charge on all loan payments collected and maintained by the trustee.
 
 
 8
 The investors filed a complaint in district court challenging the bankruptcy court's order. The district court affirmed the bankruptcy court's categorization of investor groups and imposition of fees. In addition, although the trustee had initiated no adversary proceedings to avoid advances investors had received from Golden Plan, the district court sua sponte concluded that the advances were voidable fraudulent conveyances.
 
 DISCUSSION
 I. Mootness
 
 9
 The trustee argues that the Fox investors' failure to obtain a stay of the district court's judgment moots their appeal. However, although the trustee contends that no funds are available for payment of costs that the Fox investors seek to recover, a review of the record reveals that other sources of funds are available to accord the investors relief, including $1,100,000 in unencumbered cash held by the trustee. Because the Fox investors can obtain relief, the appeal is not moot. See Salomon v. Logan (In re International Environmental Dynamics, Inc.), 718 F.2d 322, 325-26 (9th Cir.1983).
 
 II. Security or Sale
 A. Issue Defined
 
 10
 The district court found that the Fox investors held ownership interests in their notes and trust deeds, whereas the Bear investors merely held security interests in their note and trust deed. The district court further found that because the Bear investors did not have physical possession of the contested note and trust deed, they failed to perfect their security interests according to Division 9 of the California Commercial Code; therefore, the court viewed the Bear investors as general unsecured creditors of Golden Plan.
 
 
 11
 The Bear investors contend on appeal that: 1) the district court's finding of fact (that neither Golden Plan nor the Bear investors intended sales transactions of the note and trust deed) is unsupported by the record,[1] and 2) the district court erred in applying Division 9 of the California Commercial Code to the transactions at issue.
 
 
 12
 Both contentions hinge on the proper characterization of the transactions between Golden Plan and the Bear investors. The parties in the instant case correctly agree that Division 9 does not apply to an assignment intended to be a sale of a note or trust deed.[2] Consequently, the only issue on appeal is how to characterize the transactions between Golden Plan and the Bear investors: did the parties intend outright sales of the note and trust deed or did they intend loans for security?
 
 
 13
 We reverse as clearly erroneous the district court's determination that the transactions at issue were loans from the Bear investors to Golden Plan. See Semel v. Dill (In re Dill), 731 F.2d 629, 631 (9th Cir.1984).
 
 B. Nature of the Transactions
 
 14
 Whether the parties intended outright sales or loans for security is determined from all the facts and circumstances surrounding the transactions at issue. See Develop-Amatic Engineering v. Republic Mortgage Co., 12 Cal.App.3d 143, 149, 91 Cal.Rptr. 193, 196 (1970). Both documentary and testimonial evidence in the record clearly show that Golden Plan and the Bear investors intended sales of the note and trust deed.
 
 
 15
 The documentation effecting the transfer of the note and trust deed indicates that the Bear investors received absolute ownership of the instruments. On March 19, 1981, Billie Ruth Only (the "borrower") signed a promissory note naming as payee Roscoe Technology, Inc. ("Roscoe"), a Golden Plan affiliated corporation; repayment of the borrower's promissory note was secured by a deed of trust encumbering the borrower's property. On May 13, 1981, in exchange for cash payments from each of the Bear investors, Roscoe assigned its interest in the borrower's promissory note and deed of trust to the Bear investors. The assignment was evidenced by a document entitled "Assignment of Deed of Trust," which provided that Roscoe "grants, assigns and transfers [to the Bear investors] ... all beneficial interest under that certain Deed of Trust ... TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust." The assignment of the note was also separately evidenced by a document entitled "Assignment of Note," which provided that Roscoe "assigns, sets over and transfers all rights, title and interest in and to" the note to the Bear investors "WITHOUT RECOURSE." These documents suggest that the assignments at issue were unconditional and absolute transfer of the note and trust deed by Roscoe to the Bear investors.
 
 
 16
 Other than the Assignment of Deed of Trust and the Assignment of Note, the transactions between Golden Plan and the Bear investors were evidenced by documents entitled "Lenders Instructions" executed by each of the Bear investors. The Lenders Instructions, which are a Golden Plan form, provided that State Loan Servicing Inc. ("State Loan") would act as the collection agent for the loans between the borrower and the Bear investors. State Loan's contractual duties to the Bear investors included: 1) collecting monthly payments from the borrower; 2) forwarding payments to the Bear investors; and 3) handling the paperwork relating to foreclosure, if foreclosure became necessary. Such loan collection agreements suggest that the Bear investors, rather than Golden Plan or State Loan, actually owned the note. In other words, Golden Plan and State Loan merely served as intermediaries between the borrower and the Bear investors, earning fees by arranging and servicing the loans. Consequently, the Lenders Instructions reinforce the conclusion that the parties intended to make an outright transfer of the promissory note to the Bear investors.
 
 
 17
 But more importantly, the Lenders Instructions indicate that despite a practice known as "advancing," the Bear investors received no contractual guarantee of repayment or compensation in case of foreclosure. Such assumption of risk strongly suggests that the Bear investors were not in a creditor-debtor relationship with Golden Plan. Cf. Castle Rock Industrial Bank v. S.O.A.W. Enterprises, Inc. (In re S.O.A.W. Enterprises, Inc.), 32 B.R. 279, 282 (Bankr.W.D.Tex.1983) (transactions were disguised loans rather than sales of participation interests where investor "ran no real risk").[3] The Lenders Instructions provided that in case of late payment by the borrower, State Loan was authorized either to forward the payments including the applicable late charges when received from the borrower or to advance payments in consideration of which State Loan was entitled to retain all late charges due.[4] Although the Bear investors could elect to receive payments notwithstanding the fact that the borrower had defaulted on the underlying obligation, the Bear investors bargained for such a benefit by forsaking all the late charges due. Moreover, such an option does not guarantee payment of any sort in the event of foreclosure. Consequently, the practice of advancing does not alter the nature of the transactions at issue as sales.
 
 
 18
 In addition to the documentary evidence, testimony presented by the Bear investors,[5] as well as testimony of the trustee himself, indicates that sales transactions were intended. The Bear investors testified that: 1) they did not believe that they were lending money to either Golden Plan or Roscoe; 2) they thought their funds would go directly to the borrower, whose occupation and income, and the estimated value of whose property had previously been disclosed to them in the prospectus they each received;[6] and 3) they expected the borrower, rather than Golden Plan or Roscoe, to repay the obligation evidenced by the note. The trustee also admitted that the Bear investors had purchased interests in the note from Roscoe rather than loaned money to Roscoe or Golden Plan secured by an assignment of Roscoe's interest in the note.
 
 
 19
 In sum, the testimony and documentation in the record indicate that the Bear investors bargained for, and obtained a note and trust deed from the borrower and certain services, such as advances, from Golden Plan and State Loan. Because the parties intended sales of the note and trust deed, and because there is no sound legal basis for distinguishing between the Bear investors and the Fox investors, we reverse as clearly erroneous the district court's determination that the Bear investors received only security interests from Golden Plan.[7] Assuming arguendo that the district court improperly admitted into evidence as hearsay the trustee's testimony regarding Golden Plan's business practices, we conclude that sufficient evidence apart from the trustee's testimony supports a determination that the transactions were sales of the instruments, and not loans to Golden Plan.[8] Because the parties in the instant case intended sales of interests in the Bear instruments, the district court further erred in applying Division 9 of the California Commercial Code to the transactions at issue.
 
 III. Fraudulent Conveyance
 
 20
 The district court concluded that the advances investors received from Golden Plan were voidable fraudulent conveyances under section 548 of the Bankruptcy Code, 11 U.S.C. Sec. 548. The district court's decision was procedurally deficient because it contravened Bankruptcy Rule 7001, Fed.R.Bankr.P. 7001, and because it gave the investors no notice of a fraudulent conveyance claim.[9]
 
 A. Bankruptcy Rule 7001
 
 21
 Bankruptcy Rule 7001 (formerly Rule 701) requires a bankruptcy trustee to initiate adversary proceedings to "determine the validity, priority, or extent of a lien or other interest in property." Fed.R.Bankr.P. 7001. Rule 7001 applies to proceedings brought to avoid transfers by the debtor under section 548 of the Bankruptcy Code. Fed.R.Bankr.P. 7001 Advisory Committee Note (West 1984).
 
 
 22
 We have applied Rule 7001 in a case analogous to the case at bar. See Brady v. Andrew (In re Commercial Western Finance Corp.), 761 F.2d 1329 (9th Cir.1985). In Commercial Western, we invalidated a trustee's attempt to avoid, under Bankruptcy Code section 544, 11 U.S.C. Sec. 544, the debtor's partial assignments of notes and trust deeds. Instead of initiating adversary proceedings, the trustee in Commercial Western sought to avoid the assignee's interests through a provision in the Chapter 11 reorganization plan. We held that the trustee's actions contravened Rule 7001, emphasizing that the trustee's initiation of adversary proceedings was a prerequisite to a legitimate exercise of its avoidance powers:
 
 
 23
 More importantly, in trying to avoid the investors' property interests by the court's approval of the plan, the Trustee sought to place on the investors the burden of challenging the Trustee's ability to avoid their interests by requiring them to object to the plan. Normally, when a creditor files a proof of claim, it becomes prima facie evidence of the claims' validity and amount. Fed.R.Bankr.P. 301. The burden is then on the Trustee to produce evidence and facts to defeat the claim through an adversary proceeding under Rule 701. The Trustee's attempt to avoid the investors' interests by confirmation of a plan, if successful, would have circumvented the Trustee's duty to prove that he was entitled to such relief.
 
 
 24
 Commercial Western, 761 F.2d at 1337 (citations omitted).
 
 
 25
 Like the Commercial Western trustee, the trustee here initiated no adversary proceedings against the investors, but instead filed a request for special instructions. The trustee's failure to initiate adversary proceedings imposed on the investors the burden of challenging his actions and thus contravened Rule 7001.
 
 
 26
 The trustee's argument that the special instructions were not an effort to avoid the advances, but merely a request for the bankruptcy court's advice in administering the estate, is unpersuasive. Although designated as "binding on no party, except the Trustee," the special instructions authorized the trustee to condition release of notes and trust deeds in which investors claimed an interest upon repayment of any advances received from Golden Plan.
 
 
 27
 Moreover, although the trustee argues that the bankruptcy court expressly recognized the need for further adversary proceedings (Instruction No. 5B specifically conditions withholding notes and trust deeds when the investor is chargeable with fraud, "pending a trial or an adversary proceeding to be instituted by the Trustee"), the instructions contemplate no trustee-initiated adversary proceeding in instances where investors had received advances. The special instructions therefore directly affected the investors' claimed right to advances received from Golden Plan in the absence of any adversary proceeding brought by the trustee.
 
 B. Notice
 
 28
 The district court's sua sponte consideration of the fraudulent conveyance issue also rendered the proceedings procedurally defective, because the investors were denied adequate notice. The trustee's pleadings contained no allegations that the advances were fraudulent conveyances in violation of section 548. The investors were therefore denied adequate notice and opportunity to prepare a proper defense. See Slone v. Abraham (In re Prestige Spring Corp.), 628 F.2d 840, 842 (4th Cir.1980) (when pleadings contained no fraudulent conveyance allegations, bankruptcy court erred in concluding that transfers were voidable fraudulent conveyances because transferees had no notice and were denied opportunity to prepare proper defense).
 
 IV. Propriety of Fees Imposed
 
 29
 The bankruptcy court imposed on the Fox investors a 4% service charge on all loan payments collected and maintained by the trustee and a $100 administrative fee per loan released to an individual investor, pursuant to Bankruptcy Code sections 506(c) and 105(a), 11 U.S.C. Secs. 506(c), 105(a). The district court affirmed the imposition of these expenses as necessary to preserve the investors' property and because the investors were benefited by the trustee's actions. We reverse.
 
 A. Section 506(c)
 
 30
 Section 506(c) allows the trustee to recover expenses from the holder of an allowed secured claim any time the trustee expends reasonable and necessary costs to preserve or dispose of the security. Section 506(a) defines an allowed secured claim as a claim "secured by a lien on property in which the estate has an interest ... to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. Sec. 506(a).
 
 
 31
 By its terms, section 506(c) applies only to holders of "allowed secured claims." 11 U.S.C. Sec. 506(c). Neither the legislative history nor case law indicates that section 506(c) also applies to those asserting ownership, as opposed to a security interest, in property administered by the trustee. Since the bankruptcy court determined that the Fox investors were owners of the notes and trust deeds in which they claimed an interest, and not holders of "allowed secured claims," the imposition of expenses under section 506(c) was improper.
 
 
 32
 As one bankruptcy court has noted, "[i]t is not within the province of this court to depart from or enlarge upon the specific wording of the statute. Even though this may be a case where the trustee's efforts deserve compensation in excess of the maximum allowable under the law, the solution is not with the Court but with Congress." In re New England Fish Co., 34 B.R. 899, 902 (W.D.Wash.1983) (discussing Bankruptcy Code section 326, 11 U.S.C. Sec. 326).
 
 
 33
 In the instant case, the district court attempted to remedy the bankruptcy court's error by concluding that the investors' status as owners or secured claimants was "a distinction without a difference." The district judge reasoned that because the bankruptcy court processed claims filed by investors asserting an interest in the notes and trust deeds,[10] it implicitly found the existence of an "allowed secured claim," thereby justifying the imposition of costs and expenses under section 506(c). We disagree.
 
 
 34
 The mere processing of a claim under section 501 does not render it an "allowed secured claim" within the meaning of section 506. Under the district court's analysis, section 506(c) would apply to all claimants who filed proofs of claim under section 501. However, the propriety of costs imposed under section 506(c) turns on whether those costs were incurred for the benefit of a secured party. In re Codesco, Inc., 18 B.R. 225, 228 (S.D.N.Y.1982). A secured party is defined in section 506(a) as one with a claim "secured by a lien on property in which the estate has an interest." 11 U.S.C. Sec. 506(a). Since the bankruptcy court determined that the Fox investors were owners of the notes and trust deeds, they had no claim against Golden Plan "secured by a lien" on Golden Plan property.
 
 B. Section 105(a)
 
 35
 The bankruptcy court also erred in concluding that, even if the investors did not fall within the letter of section 506(c), it was empowered by virtue of its broad equitable powers under 11 U.S.C. Sec. 105(a) to charge the Fox investors with the expense of administering their notes and trust deeds.
 
 
 36
 The Bankruptcy Code does not provide for the imposition of costs on owners as opposed to secured parties. Although 11 U.S.C. Sec. 105(a) empowers the bankruptcy court to exercise its equitable powers to protect the integrity of the bankrupt's estate, there is a strong reluctance to allow the assessment of any fees and costs in bankruptcy proceedings which are not expressly authorized by the Bankruptcy Act, or that are not well established by judicial precedent. See, e.g., Robinson, Wolas & Hagen v. Gardner, 433 F.2d 1104, 1105 (9th Cir.1970) (denial of compensation for debtor's attorneys absent statutory authorization); Saper v. John Viviane & Son, Inc., 258 F.2d 826, 828 (2d Cir.1958) (denial of compensation to trustee and his attorney); Guerin v. Weil, Gotshal & Manges, 205 F.2d 302, 304 (2d Cir.1953) (denial of reimbursement for expenditures by petitioning creditor not specifically allowed by any provision of Bankruptcy Act).
 
 
 37
 It has been held that a bankruptcy court's equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act. See Guerin, 205 F.2d at 304 ("Where Congress intended that allowances [for costs and expenses] should be made it has carefully enumerated them, and any omissions must be construed as express exclusions.").
 
 
 38
 We find the case at bar to be analogous to Brandt & Brandt Printers, Inc. v. Klein (In re Friedman), 232 F.2d 151 (2d Cir.), cert. denied, 352 U.S. 835, 77 S.Ct. 53, 1 L.Ed.2d 54 (1956). In Friedman, the district court ordered certain assets, held by the bankrupt in partnership with the appellant, to be turned over to the appellant in order to wind up the partnership business. The appellant was in turn ordered to account to the bankrupt's estate upon settlement of the partnership business. The trustee claimed that the partnership assets should be subjected to charges for services it had rendered for the benefit of the estate and the creditors. The Second Circuit denied allowance of expenses, determining that the assets were not part of the bankrupt's estate and could not be charged with the compensation for the receiver, trustee, or their attorneys. Id. at 152-53.
 
 
 39
 The Friedman court's analysis is sound and is applicable to the instruments released to the Fox investors in this case. Since these instruments were owned by the Fox investors, they were not part of the Golden Plan estate and could not be administered by the trustee. Charging the Fox investors' assets with the costs of administration was improper.
 
 CONCLUSION
 
 40
 Sufficient evidence apart from the trustee's testimony supports the conclusion that the transactions were sales and not loans to Golden Plan.
 
 
 41
 The district court's distinction between the Bear and Fox investors as secured parties and owners has no sound legal basis. Consequently, the district court's determination concerning the Bear investors' rights to the assigned instruments is reversed and remanded for treatment consistent with that accorded the Fox investors.
 
 
 42
 We reverse as procedurally deficient the district court's conclusion that the advances which investors received from Golden Plan constituted voidable fraudulent conveyances.
 
 
 43
 We conclude that the imposition of expenses on the Fox investors as a precondition to their receipt of the notes and trust deeds in which they asserted ownership interests was improper.
 
 
 44
 AFFIRMED in part, REVERSED and REMANDED in part, costs on this appeal to be awarded to the appellants.
 
 
 
 [1]
 The Fox investors' status as owners is not at issue in this appeal. The sole question is whether the Bear investors should be treated differently from the Fox investors
 
 
 [2]
 Section 9102(1)(a) of the California Commercial Code provides that Division 9, which deals with secured transactions, "applies [t]o any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures, including ... instruments...." Cal.Com.Code Sec. 9102(1)(a) (West Supp.1987)
 In Huffman v. Wikle (In re Staff Mortgage & Investment Corp.), 550 F.2d 1228 (9th Cir.1977) ("Huffman" ), and Greiner v. Wilke (In re Staff Mortgage & Investment Corp.), 625 F.2d 281 (9th Cir.1980) ("Staff" ), this court held that: 1) collateral notes and trust deeds are "instruments" for the purposes of Division 9; and 2) the failure to take actual possession of these instruments by the secured party caused the security interests to be unperfected. See Huffman, 550 F.2d at 1230-31; Staff, 625 F.2d at 283.
 Like the secured parties in Huffman and Staff, the Bear investors did not take possession of the notes and trust deeds ("instruments" for the purposes of Division 9) assigned to them. Nevertheless, the parties in the instant case correctly agree that Division 9 does not apply to an assignment intended to be a sale of a note or trust deed.
 The principal test in determining whether a particular transaction comes under Division 9 is: "is the transaction intended to have effect as security? " Cal.Com.Code Sec. 9102 Uniform Commercial Code Comment 1 (emphasis added). In other words, whether an assignment confers absolute ownership, or merely a security interest which must be perfected in accordance with formalities contained in the California Commercial Code, is governed by the intentions of the parties. See St. Paul Fire & Marine Insurance Co. v. James I. Barnes Construction Co., 59 Cal.2d 691, 381 P.2d 932, 937-38, 31 Cal.Rptr. 52, 57-58 (1963).
 
 
 [3]
 This conclusion is reinforced by the fact that in indorsing the promissory note at issue to the Bear investors, Roscoe declined to assume any responsibility for payment. As mentioned earlier, the Assignment of Note expressly stated that it was "WITHOUT RECOURSE."
 
 
 [4]
 The Lender Instructions provided in pertinent part:
 It is understood that all payments in this loan due from Borrower [third-party borrowers rather than Golden Plan] on the 20th day of each month and are delinquent 10 days thereafter. In the event a payment is not received by Servicing Agent by the close of the 1st day of each month Servicing Agent is authorized to do the following: (CHECK ONE)
 [ ] Forward payments including all applicable late charges when received from Borrower.
 [ ] Advance payments in consideration of which Servicing Agent is entitled to retain all late charges due.
 
 
 [5]
 The Bear investors presented the testimony of two witnesses as being representative of the knowledge of the Bear investors
 
 
 [6]
 However, the Bear investors also testified that they never saw a financial statement of the borrower nor made an independent appraisal of the property. Nevertheless, the Bear investors knew, and intended to acquire, exactly what they would receive through the brokerage services of Golden Plan, and were relying on the borrower to make payments
 
 
 [7]
 In district court, the Bear investors argued that the instant case is governed by section 541(d) of the Bankruptcy Code which excludes from the debtor's estate "[p]roperty in which the debtor holds ... only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest...." 11 U.S.C. Sec. 541(d)
 The district court held that section 541(d) was inapplicable because it was intended to cover only the sale of mortgage backed securities guaranteed by the Government National Mortgage Association, a wholly owned corporation of the federal government. The district court cited three cases to support its ruling: Rechnitzer v. Boyd (In re Executive Growth Investments, Inc.), 40 B.R. 417 (C.D.Cal.1984); First Nat'l Bank of Boston v. Larson (In re Kennedy Mortgage Co.), 17 B.R. 957, 959 (D.N.J.1982); and Government Nat'l Mortgage Assoc. v. Adana Mortgage Bankers, Inc. (In re Adana Mortgage Bankers, Inc.), 12 B.R. 989, 1006 (N.D.Ga.1980), vacated, 687 F.2d 344 (11th Cir.1982).
 Because we have concluded that the district court erred in finding that the Bear investors were unsecured creditors of Golden Plan, we need not reach the Bear investors' alternative contention for relief.
 
 
 [8]
 On appeal, the Bear investors challenge the district court's admission into evidence of the trustee's testimony regarding Golden Plan's business practices. The district court determined that the testimony was not hearsay because it was offered to show the declarant's state of mind, and that even if in error, admission was not prejudicial
 Because the transactions between Golden Plan and the Bear investors were sales of the securities despite any hearsay testimony by the trustee, we need not reach the issue as to whether the testimony was properly admitted by the district court.
 
 
 [9]
 Because we find that the fraudulent conveyance proceedings below were procedurally defective, we need not address the merits of the fraudulent conveyances claim. The trustee's failure to initiate adversary proceedings to avoid the advances as fraudulent conveyances in these proceedings does not bar the trustee from initiating a subsequent action to avoid the advances as fraudulent conveyances. Roemelmeyer v. Walter E. Heller & Co. Southeast, Inc. (In re Lackow Bros., Inc.), 19 B.R. 601, 603 (S.D.Fla.1982)
 
 
 [10]
 11 U.S.C. Sec. 501 governs the filing of proof of claims