OPINION
 

 BOGGS, Circuit Judge.
 

 Bankruptcy trustee Homer MeClarty appeals from the decision of the district court, which had reversed the assessment by the bankruptcy court of a surcharge against Architectural Building Components (ABC). We affirm.
 

 I
 

 A
 

 In 1989, ABC (a sub-sub-eontraetor) bid successfully to Walcon Corporation (a subcontractor) for the manufacture and delivery of louvers for a budding project in Philadelphia. The general contractor for the project was H.C. Beck (HCB).
 

 A dispute arose between HCB and Walcon regarding the sufficiency of the louvers after they were delivered and installed by another subcontractor. The proprietor of the project did not pay HCB, HCB did not pay Walcon, and Walcon did not pay ABC.
 

 Walcon filed for Chapter 11 bankruptcy in 1990, and the next year ABC asserted an “unsecured” claim against it for the $54,250 contract price it claimed it was owed. It amended this claim in early 1992 to claim “priority” status. Walcon initially objected to the claim of priority status but withdrew the objection in 1992, and the court allowed the proof of claim, though without defining its status as “unsecured” or “priority.” As part of Walcon’s Chapter 11 re-organization, Foremost Manufacturing, Walcon’s parent company, received a secured interest in Walcon’s accounts receivable.
 

 
 *921
 
 B
 

 The present case began in November 1993, when an involuntary Chapter 7 petition was filed against Foremost. Foremost did not file an answer to the petition; an Order for Relief was filed against it and Homer McClarty was appointed trustee.
 

 In June 1994, ABC filed a proof of claim in this bankruptcy proceeding, alleging a “secured” claim and referencing the claim accepted in the Walcon bankruptcy proceedings. ABC explained that the secured status was based on Michigan’s “Building Contract Fund Act.” That law, more commonly known as the Builders’ Trust Fund Act, dictates that
 

 In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.
 

 M.C.L.A. § 570.151.
 

 Foremost’s main creditor appears to have been Michigan National Bank. At the time of the filing of the involuntary petition, the bank held a secured interest in all of Foremost’s real and personal property and most of its assets, including its accounts receivable. After the Order for Relief was entered, the bank struck a deal with McClarty regarding the accounts on which it had been unable to collect, including the HCB account. Under the arrangement, finalized in April 1994, McClarty hired special counsel to collect on the accounts. The proceeds of this collector’s efforts would then be split in even thirds between the bank, the collector, and the general fund for Foremost’s other creditors.
 

 ABC’s counsel asked to be chosen to pursue the HCB account, but McClarty instead decided to hire Gerald Richter, who was already familiar with Foremost and its accounts receivable. Under the arrangement, McClarty agreed to pay a one-third contingent fee to Richter’s firm
 

 out of any amount received, recovered or obtained for the [estate] or on behalf of the [estate] for the benefit of one of the [estate’s] subcontractors or suppliers for the [Philadelphia] Project, either by final judgment or by any compromise or voluntary settlement.
 

 Richter eventually reached an agreement with HCB. He claimed that the negotiations were complicated by ABC’s aggressive actions, which necessitated doing research and convincing HCB it would not have to pay twice, to both Foremost and ABC. Nevertheless, HCB was ready to settle. It had won a partial award in arbitration from the proprietor of the project. With the problem over the louvers resolved, HCB proposed to pay over the appropriate amount to McClarty-
 

 Accordingly, McClarty filed a Motion to Settle and Compromise Foremost’s claim against HCB, seeking the bankruptcy court’s approval of the $65,000 settlement. MeClarty’s motion mentioned that he was aware that “a certain supplier of materials to Walcon Corporation [i.e. ABC] ha[d] asserted a lien.” ABC objected to the proposed settlement, claiming that the $54,250 it was owed belonged to it, not the bankruptcy estate. Once again, the basis of ABC’s claim was that the money was subject to a statutory trust pursuant to the Michigan Builders’ Trust Fund Act.
 

 In September 1994, the bankruptcy court approved the HCB settlement, with the condition that the money be placed in escrow pending resolution of ABC’s claim. Both ABC and McClarty filed briefs and in October 1995 the court decided in favor of ABC. Significantly, the court said that “the funds are not property of the estate and the Trustee has no power over them pursuant to [11 U.S.C.] § 544.” There were no appeals.
 

 C
 

 McClarty filed a Motion for Surcharge against ABC on October 3Í, 1995, pursuant to 11 U.S.C. § 506(c). He asked for $18,-065.25 (his version of one-third of $54,250)
 
 *922
 
 from ABC to compensate Richter for his efforts, since, after all, Richter’s efforts had made it possible for ABC to get its money. For his part, Richter filed an application, pursuant to 11 U.S.C. § 380, seeking a $21,-667 fee from the estate, which was one-third of the $65,000 collected from HCB. If ABC were to be assessed a pro rata share of this fee, it would have owed $18,088.33.
 

 ABC objected. It argued that the court had given it the money precisely because it did not belong to the estate, and it maintained that its claim was not secured. Since § 506(c) required both of these elements and neither element was present, ABC argued, it should not be subject to a surcharge.
 

 The bankruptcy court determined in January 1996 that the imposition of some surcharge against ABC was appropriate. The question then became how much was appropriate, given ABC’s argument that, by any account, Richter would get much more money than he would have at an hourly rate. In March, the court allowed Richter the full $21,667, to be paid by the estate.
 

 Without a contribution by ABC, McClarty would have had to pay out $10,917 more than he had taken in ($21,667 to Richter and $54,250 to ABC, but only $65,000 from HCB). One week later, the court (Calculated that ABC was liable for $10,833, or just under one half of the total fee to Richter, leaving McClarty only $84 in the red for his efforts.
 

 The bankruptcy court based its determination of ABC’s liability on an expansive interpretation of 11 U.S.C. § 506(c). On its face, § 506(c) applies only to secured creditors (which the court held ABC was not) and their claims against property of the estate (which the court held ABC’s money was not). But, the court held, the position of ABC was
 
 analogous
 
 to that of a secured creditor, and so applying § 506(c) was appropriate. The court also rested its decision on the independent statutory basis of § 105(a) of the Bankruptcy Code, noting that ABC would not have gotten any money but for the settlement between HCB and the estate, and using the court’s broad powers under § 105 to apply the equitable “common fund” doctrine.
 

 ABC argued that Richter had spent some of his time convincing HCB that ABC’s claim would fail, and it would be unfair for ABC to fund those efforts, but the court disagreed, pointing out that Richter was working on a contingency basis, making it irrelevant how he spent any particular hours. The court acknowledged that ABC was not a party to the determination of Richter’s contingency fee, and it noted that McClarty and Richter knew going into the HCB negotiations that ABC might have a valid claim, but the court felt that it had to balance these considerations against the “necessity of requiring ABC to pay a reasonable sum.”
 

 As to the calculation of this reasonable sum, the court noted that the $10,833 it ordered ABC to pay, plus the $9,765 (18%) ABC owed its own lawyer for his efforts to collect the HCB debt, totaled 38% of its total recovery, which was “not at material variance from ... a reasonable contingent fee.”
 

 ABC appealed to the district court, which, ruling on the pleadings, reversed the bankruptcy court. The district court reasoned that § 506(c) is unambiguous and should be construed according to its terms, and that the bankruptcy court had exceeded its equitable powers. ABC thus owed nothing to the estate, which still had to pay Richter in full.
 

 McClarty filed this timely appeal.
 

 n
 

 The only issue presented on appeal is whether the bankruptcy court was authorized to impose this surcharge. We conclude that it was not.
 

 A
 

 The bankruptcy court claimed authority to impose this surcharge under 11 U.S.C. § 506(c) (which provides for surcharges) and § 105(a) (which gives the court broad equitable powers).
 

 11 U.S.C. § 506(e) states:
 

 The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property
 
 *923
 
 to the extent of any benefit to the holder of such claim.
 

 Section 506 itself is entitled “Determination of secured status,” and its other subsections deal with that question. 11 U.S.C. § 506.
 

 The purpose of the section, which was taken from common law, has been explained as follows:
 

 The general rule is that normal administrative expenses of the bankruptcy estate may not be charged against secured collateral but may share in the distribution of the unencumbered assets of the debtor____ Section 506(c) of the Bankruptcy Code is the exception to that rule____ The provision is equitable in origin, preventing a windfall tó a secured creditor at the expense of the trustee or debtor in possession by shifting the costs of preserving or disposing of a secured party’s collateral from the bankruptcy estate to the secured party.
 

 I.R.S. v. Boatmen’s First Nat’l Bank,
 
 5 F.3d 1157, 1159 (8th Cir.1993). In other words, the general rule in bankruptcy is that administrative expenses are paid only after secured creditors are. But to prevent secured creditors from, say, getting free warehousing for their collateral at the expense of the rest of the estate, courts can make the secured creditors contribute to cover those expenses.
 
 See Precision Steel Shearing, Inc. v. Fremont Financial Corp. (In re Visual Industries, Inc.),
 
 57 F.3d 321, 325 (3d Cir.1995).
 

 ABC is not a secured creditor, and its $54,250 is not part of the estate, let alone “property securing an allowed secured claim.” The plain meaning of § 506(c) thus militates against applying it to ABC. We prefer this “plain meaning” approach for the simple reason that § 506(c) is unambiguous. The Supreme Court forcefully declared, in a case interpreting § 506(b), that “as long as ■ the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.”
 
 United States v. Ron Pair Enterprises,
 
 489 U.S. 235, 240-41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989);
 
 see Commissioner of Internal Revenue v. Asphalt Products Co.,
 
 482 U.S. 117, 121, 107 S.Ct. 2275, 2278, 96 L.Ed.2d 97 (1987) (“Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly aiid intentionally provided.”).
 

 B
 

 Subsection (c) has been read broadly in another context, which McClarty suggests gives the lie to our conclusion. In a series of cases, some circuits have held that parties other than the trustee have
 
 standing
 
 to seek surcharges under § 506(c).
 
 See, e.g., I.R.S. v. Boatmen’s First Nat’l Bank,
 
 5 F.3d 1157 (8th Cir.1993) (allowing surcharge to be sought by administrative claimant who expended resources caring for secured creditor’s collateral);
 
 North County Jeep and Renault, Inc. v. General Electric Capital Corp. (In re Palomar Truck Corp.),
 
 951 F.2d 229 (9th Cir.1991) (extending standing to third-party claimants as well as trustees),
 
 cert. denied,
 
 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992).
 
 But see Loudoun Leasing Devel. Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.),
 
 128 F.3d 203 (4th Cir.1997) (rejecting extension of standing to third parties).
 

 . We reject McClarty’s argument for two reasons. First, we have never accepted this expansion of § 506(c) standing, and so we certainly will not use it as the basis to stretch the statute in another context.
 

 Second, the expansion of standing is a much less radical departure from the language of the statute than is the one for which McClarty argues. The plain purpose of § 506(c) — to prevent unjust enrichment of secured creditors — is one that may be important to parties other than to the trustee, and the trustee’s interest may not be significant enough to spur him to act. When courts allow these other parties to seek surcharges, they are improving the probability that the statute’s true purpose will be vindicated.
 

 But even if we were inclined to construe § 506(e) liberally in a different context (and nothing here should be taken to suggest that we are), we would
 
 not
 
 do so in the present context. This is because, in contrast to the broadening of standing, expanding the reach
 
 *924
 
 of § 506(c) as the bankruptcy court attempted to do alters the statute’s purpose (this is not to say that Congress may not wish to revisit this issue, only that we may not). Although the bankruptcy court argued that ABC is in a position similar to that of a secured creditor, it was wrong in at least one important sense. A secured creditor has an interest in its collateral, but that collateral is the property of the estate. The trustee has a duty to maintain the collateral, concomitant ■ with his fiduciary duties in managing the estate. ABC’s $54,250, by contrast, was not the property of the estate, and McClarty was under no requirement to attempt to get it by settling with HCB. McClarty took a considered risk, and lost. That contrasts with the “preserv[ation]” or “dispos[al]” of property securing a secured interest, which is inherently a matter of the trustee’s duty, not inherently one of his discretion. Thus, expanding § 506(c) to reach beyond the property of the estate and beyond secured creditors rewrites the law. This we will not do.
 

 C
 

 Even if we were somehow inclined to construe this statute broadly, this would not be the case in. which to do it. To the extent that McClarty and the estate suffered an unfortunate result, the solution lies in re-thinking the fundamental errors McClarty committed, not in our re-writing the law to correct them. We raise these arguments not to justify our interpretation of § 506(c) (we rely, after all, on its plain meaning), but rather to refute McClarty’s arguments that our result is clearly unjust.
 

 McClarty and Richter knew all along that ABC had a claim under the Builders’ Trust Fund Act. Richter had been chosen as special counsel because of his knowledge of these matters, and decided to take the chance that he would prevail over ABC. For Richter, of course, this gamble made sense, because he got paid either way. The error, then, was McClarty’s — the contingency fee agreement was worded in such a way as to require him to pay Richter a full one-third of the settlement, even though ABC got most of the money. The agreement gave Richter one-third of
 

 any amount received, recovered or obtained for the [estate]
 
 or on behalf of the [estate] for the benefit of one of the [estate’s] subcontractors or suppliers
 
 for the [construction) Project, either by final judgment or by any compromise or voluntary settlement.
 

 (emphasis added). Had McClarty left the emphasized language out of the agreement, two important differences would have resulted. First, Richter would have been under a sounder set of incentives. He would have been motivated to collect only on those accounts that were likely to yield substantial assets to the estate. Second, if Richter had decided to proceed against HCB anyway, his fee would have been much lower, because he would have gotten one third of only the $10,750 that went to the estate. This amount might have still been enough to make the effort worth Richter’s while, more so because he then would not have had to spend so much time persuading HCB to ignore ABC’s claim.
 

 Alternately, since McClarty was not required to pursue the HCB claim, it may have made sense for him to make an arrangement with ABC, under which ABC agreed
 
 ex ante
 
 to contribute to paying Richter’s fees. If, as McClarty claims, ABC could only get its money through the bankruptcy proceedings, ABC surely would have agreed to some sort of fee-sharing arrangement. If ABC is reaping a windfall, it is only because McClarty let it.
 

 D
 

 As a final matter, the district court was correct in noting that, although the bankruptcy court has broad equitable powers under 11 U.S.C. § 105(a), those powers are not unlimited. Our precedent tells us that “whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.”
 
 XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),
 
 16 F.3d 1443, 1453 (6th Cir.1994) (quoting
 
 Norwest Bank Worthington v. Ahlers,
 
 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988)). It does not suffice for the bankruptcy court to announce that, independent of any precedent
 
 *925
 
 or any other provision of the Code, “equity” requires a surcharge.
 

 In so holding, we parallel the Ninth Circuit’s determination in
 
 Bear v. Coben (In re Golden Plan of California, Inc.),
 
 829 F.2d 705 (9th Cir.1986). In
 
 Bear,
 
 the investors had interests in notes held by the bankrupt entity. The bankruptcy court held that some of these investors had actual ownership interests in the instruments.
 
 Id.
 
 at 707. The bankruptcy court imposed costs and expenses on these investors, but the Ninth Circuit reversed:
 

 The bankruptcy court also erred in concluding that, even if the investors did not fall within the letter of section 506(e), it was empowered by virtue of its broad equitable powers under 11 U.S.C. § 105(a) to charge the Fox investors with the expense of administering their notes and trust deeds.
 

 The Bankruptcy Code does not provide for the imposition of costs on owners as opposed to secured parties. Although 11 U.S.C. § 105(a) empowers the bankruptcy court to exercise its equitable powers to protect the integrity of the bankrupt’s estate, there is a strong reluctance to allow the assessment of any fees and costs in bankruptcy proceedings which are not expressly authorized by the Bankruptcy Act, or that are not well established by judicial precedent.
 

 It has been held that a bankruptcy court’s equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act.
 

 Id.
 
 at 713 (citations omitted). We agree.
 

 Ill
 

 We therefore AFFIRM the decision of the district court.