113 F.3d 1091
 30 Bankr.Ct.Dec. 1105, Bankr. L. Rep. P 77,411,
32 UCC Rep.Serv.2d 962,
97 Cal. Daily Op. Serv. 3775,
97 Daily Journal D.A.R. 6407
 In re COUPON CLEARING SERVICE, INC., Debtor.
FOOTHILL CAPITAL CORPORATION, Appellant,
v.
CLARE'S FOOD MARKET, INC.; Shoprite of Oakland, Inc.;
Brown's Super Stores, Inc.; Singers Supermarkets, Inc.;
Glass Gardens, Inc.; Shop-Rite at 26th St., Inc.; Shoprite
of Lincoln Park, Inc.; Big V Supermarkets, Inc.; Shoprite
of Hunterdon County, Inc.; Shop-Rite of Clinton, Inc.;
Shoprite of Carteret, Inc.; Inserra Supermarkets, Inc.;
Shoprite of Perth Amboy, Inc.; Nutley Park Shop-Rite, Inc.;
Sunrise Market, Inc.; Racar, Inc.; Trio Food Centers,
Inc.; Perlmart, Inc.; Village Supermarkets, Inc.;
Brookdale Shoprite, Inc.; Bliss, Inc.; Shop-Rite of
Pennington, Inc.; Shoprite of Parsippany; Shoprite of
Little Falls, Inc.; Landis Supermarkets, Inc.; Delsea
Supermarkets, Inc.; Grade A Market, Inc., Appellees.
 No. 95-55864.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 6, 1996.
Decided May 20, 1997.
 
 Robert H. Stopher, Santa Ana, California, for debtor.
 Clifford J. Meyer, Buchalter, Nemer, Fields & Younger, Newport Beach, California, for appellant.
 Alan M. Mansfield, William S. Dato, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, California, Dennis J. Block, Weil, Gotshal & Manges, for appellees.
 Appeal from the United States District Court for the Central District of California, Linda H. McLaughlin, District Judge, Presiding. D.C. No. SACV-94-936-LHM.
 Before: FLETCHER and TASHIMA, Circuit Judges, and RESTANI,* United States Court of International Trade Judge.
 RESTANI, Judge:
 
 
 1
 This matter arises from a dispute between plaintiffs-appellees Clare's Food Market, Inc., et. al. ("the ShopRite Retailers") and defendant-appellant Foothill Capital Corporation ("Foothill") over the entitlement to the proceeds of cents-off coupons which were redeemed by the Chapter 7 debtor, Coupon Clearing Service, Inc. ("CCS"). CCS was a coupon clearing house to which retail stores and chains submitted coupons in bulk. In turn, CCS was to pay the ShopRite Retailers for the coupons within a prescribed number of days. Foothill extended a revolving line of credit to CCS and now claims entitlement to the coupon proceeds by reason of its security interest in CCS's inventory, equipment, and accounts. The ShopRite Retailers, however, contend that the coupon proceeds belong to them and CCS could not assign the proceeds to Foothill as CCS was their agent, or otherwise held the coupons and proceeds as trustee or bailee for them.
 
 
 2
 The bankruptcy court concluded that Foothill's perfected security interest in the coupon proceeds had priority over the interests of the ShopRite Retailers. The district court, however, found that numerous issues of material fact existed which precluded the entry of summary judgment for either party, vacated the bankruptcy court's order, and remanded for further proceedings. Foothill appeals the district court's order.
 
 
 3
 We exercise jurisdiction over this appeal and reverse the district court's order vacating the bankruptcy court's opinion. Further, we affirm the bankruptcy court's opinion and order granting summary judgment to Foothill.
 
 FACTS[1]
 
 4
 In accordance with supermarket industry practices, customers presented the ShopRite Retailers with manufacturer coupons[2] to receive a reduction in the purchase price of certain products. For honoring the coupons, the manufacturers would reimburse the ShopRite Retailers the reduction in the purchase price of the products, along with a handling fee. In order to facilitate the processing of the large volume of coupons submitted to the ShopRite Retailers by their customers, the manufacturers permitted the ShopRite Retailers to use the services of approved coupon clearinghouses. CCS operated as such a clearinghouse.
 
 
 5
 To redeem the coupons, the ShopRite Retailers would ship the coupons to CCS. Upon receipt of the coupons, CCS would record the number, weight, amount, and identity of which retailer sent the coupons. CCS then would assign a "batch number" to each shipment of coupons, weigh the shipment, and send an acknowledgment to the retailer, disclosing the date of receipt, batch number, and weight. The coupons would then be sent to Cupomex, CCS's Mexican affiliate, for sorting, counting, tagging, and bundling. CCS would prepare an invoice for the manufacturer which identified the retailer by name and address, the number of coupons, the face value, and the total handling fee. Each coupon bundle and invoice would then be sent to the appropriate manufacturer.
 
 
 6
 Upon receipt, the manufacturer would count the coupons, verify that the coupons had been properly redeemed by the retailer, and pay CCS the redemption and handling fee payment. The manufacturer would also forward to CCS a list of retailers submitting coupons, the number of coupons, and the amounts paid for the coupons. If some coupons were not redeemable, the manufacturer would specify the retailer's name, number of coupons, dollar amounts, and reasons for non-redemption.
 
 
 7
 As a condition of accepting coupons from CCS, many manufacturers required CCS to enter into clearinghouse authorization agreements ("Clearinghouse Agreements").[3] The invoices sent to the manufacturers by CCS, however, stated that all rights to the coupon proceeds had been assigned to CCS and that all payments were to be remitted to CCS.
 
 
 8
 Most of the ShopRite Retailers entered into contracts setting forth the terms governing their relationships with CCS ("Service Agreements"). The Service Agreements uniformly provided that CCS would advance to the retailers the amount equal to the face value of the coupons plus the handling fee, less CCS's service fee (typically one to two cents per coupon processed) and any chargeback on coupons that CCS had previously paid, but were not honored by the manufacturer.[4][4] The Service Agreements also provided that: (1) CCS was entitled to keep the proceeds of the checks from the manufacturers; (2) CCS had the sole right to process the coupons; (3) any funds remitted directly to the retailers were to be turned over to CCS; and (4) the retailers were required to reimburse CCS for any chargebacks. The Service Agreements did not classify CCS as the retailers' agent. In 1991, however, CCS distributed an advertising brochure to the ShopRite Retailers in which it referred to itself as the ShopRite Retailers' agent.
 
 
 9
 The parties agree that there was never a sale of the coupons to CCS. The Service Agreements, however, varied regarding CCS's right to assign an interest in the coupon proceeds. There were three distinct types of Service Agreements. The Service Agreements entered into with Mid-Atlantic and Rocky Mountain provided that CCS would submit and invoice the coupons on the clients' behalf and did not contain any provisions regarding CCS's right to assign the coupons or the coupon proceeds. The Service Agreements entered into with Dan's, Clare's, Lawson, Woolworth, and Scrivner's provided that the coupons were deemed assigned to CCS. The Service Agreements entered into with Mars and C & K specifically granted CCS the right to assign and hypothecate or otherwise encumber the coupons and proceeds.
 
 
 10
 On November 4, 1988, Foothill extended a revolving line of credit to CCS up to the lesser of $10,000,000 or 75% of CCS's accounts receivable. CCS carried the amounts due from the manufacturers on its books as accounts receivable. In connection with the line of credit, Foothill filed financing statements to perfect its security interest. Pursuant to CCS's agreement with Foothill, all payments from the manufacturers were forwarded directly to a lockbox at Foothill's bank in Chicago. Foothill was authorized to open the correspondence addressed to CCS, separate the checks from the manufacturers, and send copies of the checks and the other documentation to CCS. Foothill applied the payments from the manufacturers to CCS's obligations under the loan agreement.
 
 PROCEDURAL HISTORY
 
 11
 In October 1991, after CCS failed to reimburse the ShopRite Retailers for $4 million in coupons, the ShopRite Retailers filed an action against CCS, Foothill, and others in the California Superior Court. The ShopRite Retailers obtained a temporary restraining order and a preliminary injunction imposing a constructive trust on the coupons and proceeds therefrom. In November 1991, CCS filed a Chapter 7 bankruptcy petition and thereafter, Foothill removed the case to federal bankruptcy court.
 
 
 12
 In November 1993, after extensive discovery, the ShopRite Retailers and Foothill (as well as other retailers involved in other adversary proceedings who have since settled their claims against Foothill) filed cross-motions for summary judgment. The Trustee joined in Foothill's motion and opposed the ShopRite Retailers' motion. After hearing the motions, the bankruptcy court issued a memorandum opinion which embodied its findings of fact and conclusions of law on April 1, 1994. In an order dated March 31, 1994, the bankruptcy court granted Foothill's motion for summary judgment and concluded: (1) CCS and the ShopRite Retailers did not have an agency relationship, the assignments were not for collection purposes only, and CCS did not hold coupon proceeds in trust for the ShopRite Retailers; (2) CCS had sufficient rights in coupon proceeds under California commercial Code § 9203(1) to grant Foothill a valid security interest and Foothill's interest attached to the proceeds; and (3) CCS did not need to be licensed as a collection agency and thus, the service Agreements between the ShopRite Retailers and CCS were not void. In addition, the parties were ordered to file supplemental briefs regarding the applicability of the Personal Property Broker Law ("PPBL"). After the supplemental briefs were filed, the bankruptcy court issued a second memorandum opinion on July 12, 1994, in which the court determined that CCS's business operations were not subject to the PPBL and that, even if PPBL did apply, CCS's contracts with the ShopRite Retailers were not rendered void by that law.
 
 
 13
 The ShopRite Retailers appealed the bankruptcy court's order to the district court. On April 10, 1995, the district court issued an order which vacated the order of the bankruptcy court entered on July 14, 1994, as amended September 20, 1994, and remanded for proceedings consistent with the minute order. The minute order of April 10, 1995 stated that both parties disputed numerous purportedly "undisputed" facts and, as the ShopRite Retailers failed to meet the requirement that "there is no genuine issue as to any material fact" pursuant to Fed.R.Civ.P. 56(c), the order was vacated and remanded for further proceedings. Foothill subsequently filed a motion for rehearing which was denied. In a minute order issued on May 5, 1995, the district court stated that its earlier order vacated the bankruptcy court's order "in its entirety " and directed the bankruptcy court on remand "to reconsider both of the cross-motions for summary judgment in further proceedings, in light of disputed facts on which both motions depend." (Emphasis in original.) Foothill subsequently filed an appeal with this court.
 
 STANDARD OF REVIEW
 
 14
 We review the district court's grant of summary judgment de novo. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996).
 
 DISCUSSION
 I.
 
 15
 The ShopRite Retailers contend that because the district court's order is interlocutory and not a final, appealable order, this court lacks jurisdiction pursuant to 28 U.S.C. § 158(d). The district court has original jurisdiction over bankruptcy cases. Id. § 1334. The district court automatically refers such cases to the bankruptcy court. Id. § 157(a). The bankruptcy court may enter final orders and judgments in cases under Title 11 of the Bankruptcy Code and in core proceedings. Id. § 157(b)(1). In proceedings that are not core proceedings, but are otherwise related to a case under Title 11, the bankruptcy court has jurisdiction to submit proposed findings of fact and conclusions of law but it may not issue final orders or judgments. Id. § 157(c)(1). The bankruptcy court makes the initial determination whether a case is a core proceeding or an otherwise related proceeding. Id. § 157(b)(3).
 
 
 16
 The district court has bankruptcy appellate jurisdiction pursuant to 28 U.S.C. § 158(a). We have jurisdiction over final decisions of the district court under 28 U.S.C. § 1291 (except where direct review may be had in the Supreme Court).
 
 
 17
 Courts of appeal also have jurisdiction over "appeals from all final decisions, judgments, orders, and decrees entered under [28 U.S.C. § 158(a) and (b) ]." Id. § 158(d). Under 28 U.S.C. § 158(d), we have jurisdiction when the bankruptcy court order and the lower appellate decision are both final orders. Franchise Tax Bd. v. MacFarlane (In re MacFarlane ), 83 F.3d 1041, 1044 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); Dominguez v. Miller (In re Dominguez), 51 F.3d 1502, 1506 (9th Cir.1995). We apply a "pragmatic approach" to decide the finality of both courts' decisions. In re MacFarlane, 83 F.3d at 1044; King v. Stanton (In re Stanton), 766 F.2d 1283, 1285 (9th Cir.1985).
 
 
 18
 Recognizing "the unique nature of bankruptcy procedure," this court has concluded that "certain proceedings in a bankruptcy case are so distinctive and conclusive either to the rights of the individuals or the ultimate outcome of the case that final decisions as to them should be appealable as of right." In re Stanton, 766 F.2d at 1285-86 (quoting Mason v. Integrity Ins. Co. (In re Mason), 709 F.2d 1313, 1316-17 (9th Cir.1983)). In the present case, the bankruptcy court's order granting summary judgment to Foothill unquestionably affected the rights of the parties and the ultimate outcome of the case. Consequently, the opinion and order of the bankruptcy court may be deemed final and appealable.
 
 
 19
 The more difficult question is whether the district court's order vacating the bankruptcy court's opinion and order and remanding for further fact-finding and bankruptcy proceedings was final and appealable. This court has stated that, "[w]hen a lower appellate decision reverses a final order and remands, we consider the 'systemic interest in preserving the bankruptcy court's role as the finder of fact,' avoidance of piecemeal litigation, and overall enhancement of judicial efficiency." In re Dominguez, 51 F.3d at 1506 (quoting Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership ), 2 F.3d 899, 904 (9th Cir.1993), 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (motion to vacate judgment denied; case dismissed as moot)); see also Vylene Enters., Inc. v. Naugles, Inc. (In re Vylene Enters., Inc.), 968 F.2d 887, 895 (9th Cir.1992). While this court ordinarily lacks jurisdiction when the lower appellate decision remands for further factual findings related to a central issue raised on appeal, the court "may assert jurisdiction if the appellate 'issue is legal in nature and its resolution either 1) could dispose of the case or proceeding and obviate the need for factfinding; or 2) would materially aid the bankruptcy court in reaching its disposition on remand.' " In re Dominguez, 51 F.3d at 1506-07 (quoting In re Bonner Mall Partnership, 2 F.3d at 904) (emphasis in original).
 
 
 20
 The ShopRite Retailers contend that there are several disputed facts which preclude summary judgment for either party. First, although the ShopRite Retailers admit that it is undisputed that CCS was to remit coupon proceeds on a fixed schedule (28 or 35 days from CCS's receipt of the coupons), the ShopRite Retailers argue that the inferences Foothill draws from this fact are without evidentiary support and contradicted by the record. Foothill infers from the fixed schedule that: (1) there was always a time gap between when CCS paid the ShopRite Retailers and when it collected from the manufacturers; (2) CCS was routinely advancing funds to the ShopRite Retailers (funds presumably lent by Foothill); and (3) CCS and the ShopRite Retailers had a debtor-unsecured creditor relationship, entitling CCS to assign to Foothill a security interest in the coupons. Second, the ShopRite Retailers argue that although CCS was under no duty to segregate the coupon proceeds from its own funds, the coupons and the coupon proceeds were completely and separately identifiable and traceable. Finally, in regards to a clause in the Service Agreements that, "Retailer will deem coupons submitted to [CCS] as being assigned to [CCS]," the ShopRite Retailers contest the inference allegedly made by Foothill that all rights, title, and interest in the coupons and coupon proceeds were transferred to CCS. The ShopRite Retailers maintain that the coupons were assigned to CCS for collection purposes only.
 
 
 21
 We find that what the ShopRite Retailers contend are disputed facts, however, are really inferences made from undisputed facts. It is undisputed that: (1) CCS was to reimburse the ShopRite Retailers for the coupons submitted on a fixed schedule; (2) CCS was under no duty to segregate the coupon proceeds from its own funds; and (3) under some of the Service Agreements, the coupons and coupon proceeds expressly were assigned to CCS. The inferences to be made from the facts are legal and not factual. See Magnecomp Corp. v. Athene Co., Ltd., 209 Cal.App.3d 526, 257 Cal.Rptr. 278, 283 (1989) ("Ordinarily, the question of agency is one of fact; however, where the evidence is undisputed the issue becomes one of law." (citing Mantonya v. Bratlie, 33 Cal.2d 120, 199 P.2d 677, 681-82 (1948))). The ShopRite Retailers bring to our attention the recent case, Almar Communications Ltd. v. Telesphere Communications, Inc. (In re Telesphere Communications, Inc.), 205 B.R. 535, 544 (N.D.Ill.1997), involving a somewhat similar three-party situation, in which the district court remanded the proceedings to the bankruptcy court for further factual findings as to the existence and scope of an agency relationship. We find this case distinguishable as in Telesphere Communications, Inc. the business documents defining the relationship between the parties supported the existence of an agency relationship, while the conduct of the parties suggested otherwise. See id. at 543-44. We find no such contradiction here. Accordingly, we will exercise jurisdiction over this appeal as the central issue is legal in nature, its resolution will dispose of the summary judgment motions and obviate the need for fact finding.
 
 II.
 
 22
 Section 541 of the Bankruptcy Code defines the property of the bankruptcy estate. 11 U.S.C. § 541. The nature and extent of a debtor's interest in property is determined by state law, with the estate having no greater rights in property than those held by the debtor prior to bankruptcy. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); 11 U.S.C. § 541(d). Property that is held in trust by a debtor for another, however, is not property of the estate. Mitsui Mfrs. Bank v. Unicom Computer Corp. (In re Unicom Computer Corp.), 13 F.3d 321, 324 (9th Cir.1994). This rule of law applies with equal force to constructive trusts that arise by operation of state law. Id. Under California law, a constructive trust may be imposed, absent express agreement, when a party wrongfully detains another's property. Id. at 325.
 
 
 23
 The ShopRite Retailers counter that under California's laws of agency, trust, and bailment, Foothill is not entitled to assert a valid perfected security interest over CCS's coupon proceeds because CCS held the coupon proceeds in trust for the ShopRite Retailers. Under Division 9 of the California Commercial Code ("the Code"), in order to create a valid and enforceable security interest, the purported transferee (here, CCS) must have "rights in the collateral." Cal.Com.Code § 9203(1)(c) (West 1990). The Code, however, does not define "rights in the collateral" and provides that the law of bankruptcy, agency, and other common law principles must be applied in order to define any such "rights." Cal.Com.Code § 1103 (West 1964).
 
 A. Agency
 
 24
 California courts define an agent as "anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter, and to render an account of such transactions." Violette v. Shoup, 16 Cal.App.4th 611, 20 Cal.Rptr.2d 358, 363 (1993) (quotations omitted). Proof of an agency relationship may be "established by evidence of the acts of the parties and their oral and written communications." Magnecomp Corp., 257 Cal.Rptr. at 283 (quoting Whittaker v. Otto, 188 Cal.App.2d 619, 10 Cal.Rptr. 689 (1961)). One of the chief characteristics of an agency relationship is the "authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties." Violette, 20 Cal.Rptr.2d at 363. In the instant case, CCS was authorized to act on behalf of the ShopRite Retailers in submitting the coupons to the manufacturers for redemption as evidenced by the Service Agreements and the conduct of the parties. The authorization element, therefore, is met.
 
 
 25
 The other important aspect in determining the existence of an agency relationship is the degree of control exercised by the principal over the activities of the agent. Id. The right to control, rather than its exercise, is sufficient to meet this standard. McCollum v. Friendly Hills Travel Ctr., 172 Cal.App.3d 83, 217 Cal.Rptr. 919, 923 (1985). If control may be exercised only as to the result of the work and not the means by which it is accomplished, however, an independent contractor relationship exists. See Dorsic v. Kurtin, 19 Cal.App.3d 226, 96 Cal.Rptr. 528, 536 (1971).
 
 
 26
 The bankruptcy court concluded that the control element was not met here as: (1) the ShopRite Retailers did not have the ability to control the means by which CCS carried out the services required of it under the Service Agreement, i.e., to sort, label, and process the coupons for redemption to the manufacturers; (2) the ShopRite Retailers did not have the authority to order CCS to alter its method of operation, nor the hours of operation; (3) the ShopRite Retailers had no ability to hire, fire or otherwise control CCS's employees; and (4) the ShopRite Retailers had no right to demand or restrict CCS's use of the coupon proceeds before the agreed time specified in the Service Agreements for payment. Accordingly, the bankruptcy court concluded that absent the ability to control CCS's actions, the ShopRite Retailers were not acting as principal in an agency relationship, rather CCS was the ShopRite Retailers' independent contractor.
 
 
 27
 The ShopRite Retailers contend that the bankruptcy court erroneously concluded that because they did not also exercise day-to-day control over CCS, CCS could not be treated as their agent. It is well-established that one who contracts to act on another's behalf and is subject to the other's control, except with respect to his physical control, may still be acting as an agent and also as an independent contractor. Restatement (Second) of Agency § 14N (1958); see also Penthouse Int'l, Ltd. v. Barnes, 792 F.2d 943, 947 (9th Cir.1986) (photographer found to be both agent of magazine and independent contractor); City of Los Angeles v. Meyers Bros. Parking Sys., Inc., 54 Cal.App.3d 135, 126 Cal.Rptr. 545, 546 (1975) (company managing parking lots for city found to be both agent and independent contractor). The ShopRite Retailers claim that the correct test to be applied in this case is whether CCS was subject to some degree of control by the ShopRite Retailers through monitoring and restrictions on CCS's manner and method of operations, and not the extent to which the ShopRite Retailers "micromanaged" CCS's conduct of its business.
 
 
 28
 We find that the cases cited by the ShopRite Retailers readily distinguishable from the present case on the facts. In Penthouse Int'l Ltd., the court found that a freelance photographer had implied authority to modify a model release contract and was thus found to be both an agent and an independent contractor for the magazine. 792 F.2d at 947-48. In City of Los Angeles, the court held that a parking lot operator was both an agent and an independent contractor for the city, which controlled, inter alia, the operator's budget, the operating policy, parking rates, validation privileges, and removal of unsatisfactory employees. 126 Cal.Rptr. at 547. In both of these cases, the principals had much more control over the agents than the ShopRite Retailers had over CCS. Additionally, we find that comment b to the Restatement (Second) of Agency § 14N, rather than comment a (which states that collection agencies, like attorneys, are fiduciaries), applies to this situation. Comment b states that, "[a] person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent contractor." Restatement (Second) of Agency § 14N cmt. b (1958). The ShopRite Retailers' only right of control with respect to CCS was to require CCS to perform its contracts. Consequently, we conclude that no agency relationship existed between CCS and the ShopRite Retailers as the retailers lacked the requisite control over CCS to establish such a relationship. See Farrell Lines, Inc. v. Titan Indus. Corp., 306 F.Supp. 1348, 1350 (S.D.N.Y.1969) (freight forwarder found to be independent contractor and not agent of shipper as "critical elements of control and exclusivity" were lacking); see also Koninklijke Nedlloyd BV v. Uniroyal, Inc., 433 F.Supp. 121, 128 (S.D.N.Y.1977) (same).
 
 B. Trust
 
 29
 Regardless of the existence of an agency relationship, the ShopRite Retailers contend that the coupon proceeds were held in trust for the ShopRite Retailers by CCS. Although CCS was not required to segregate the coupon proceeds, the ShopRite Retailers argue that CCS lacked the authority to commingle the coupon proceeds with its general operating funds or pledge them as security. Furthermore, the ShopRite Retailers claim that the fact that CCS placed the coupon proceeds of different retailers in one lockbox account is not determinative where the proceeds are separately identifiable and traceable, especially where the amounts received by the agent are small or where there is a series of transactions. See, e.g., In re Penn Cent. Transp. Co., 486 F.2d 519, 525 (3d Cir.1973) (trust imposed despite commingling since segregation of funds could be impractical due to their magnitude and number of entities involved). In Penn Central Transportation Co., the debtor Penn Central collected money for interline railroads and deposited the proceeds in its general account, commingling the proceeds of different carriers with its own funds. Id. The court in Penn Central Transportation Co. found that because the collected funds were traceable and no provision for interest payments by the carriers existed, Penn Central held the funds in trust for the carriers. See id. at 526. The court noted that, "[w]hile generally commingling indicates a debtor-creditor relationship and not a trust, it is only one indicium and it too is not necessarily conclusive." Id. at 524.
 
 
 30
 We find that a series of cases involving the relationship between freight forwarders or shipping brokers, shippers of goods, and carriers provides better guidance in this matter. See Delta Pride Catfish, Inc. v. Marine Midland Bus. Loans, Inc., 767 F.Supp. 951 (E.D.Ark.1991); Dampskibsselskabet Af 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes, Inc.), 35 B.R. 830 (Bankr.S.D.N.Y.1984); Pan American World Airways, Inc. v. Continental Bank (In re Shulman Transp. Enters., Inc.), 33 B.R. 383 (Bankr.S.D.N.Y.1983). In each of these cases, the amounts collected for freight by the freight forwarders from the shippers of the goods were found not to be held "in trust" for the carriers because the freight forwarders were not prohibited from commingling funds and payments to the carriers were not required to be made from the same funds received from the shippers. Moreover, in each of these cases, the funds were traceable to the party from which they were received (as such accounting was necessary for billing).
 
 
 31
 In the present case, we conclude that CCS did not hold the coupons proceeds in trust for the ShopRite Retailers as CCS was required to make payments to the ShopRite Retailers on a fixed schedule regardless of when CCS was paid by the manufacturers. Furthermore, none of the Service Agreements imposed any obligation on CCS to segregate amounts received from manufacturers or forbade the commingling of such accounts with CCS's general funds. See In re Black & Geddes, Inc., 35 B.R. at 836 ("It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists.").
 
 
 32
 Finally, the ShopRite Retailers assert that it is undisputed that they, not CCS, bore the complete risk of non-reimbursement. In an agency or trust relationship, it is the principal or beneficiary, who bears the risk of loss. See In re Woodson Co., 813 F.2d at 271 (assumption of entire risk of loss by mortgage broker resulted in finding of debtor-creditor relationship); In re Taxes, Aiea Dairy, Ltd., 46 Haw. 292, 380 P.2d 156, 160 (1963) (entire risk of loss assumed by milk producer, rather than distributor, indicated agency relationship). The ShopRite Retailers maintain that if a manufacturer either refused to pay, paid and later dishonored a coupon, or for any other reason did not send reimbursement, CCS was not at risk for the loss. In that situation, it would be left to the ShopRite Retailers to pursue reimbursement directly from the manufacturers.
 
 
 33
 Although risk of loss is discussed in some of the cited cases, we find that it is a secondary factor, which is subordinate to commingling principles. Indeed, many of those cases do not refer to "risk of loss" at all. See, e.g., Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp., Inc.), 810 F.2d 270, 274-75 (D.C.Cir.1987) (debtor-creditor relationship found where contract does not require segregation and delivery of funds to creditor); Salem v. Lawrence Lynch Corp. (In re Farrell & Howard Auctioneers, Inc.), 172 B.R. 712, 716 (Bankr.D.Mass.1994) (court found auction proceeds were not held in trust for owner where no obligation to segregate proceeds or hold in trust). Moreover, we conclude that although CCS did have the right to charge certain non-reimbursement costs back to the ShopRite Retailers, the entire risk of loss was not assumed by the retailers. For example, if a retailer could not be located or CCS otherwise was unable to collect from it, CCS bore the loss. More importantly, CCS was required to pay the ShopRite Retailers on a fixed payment schedule, regardless of when and if the coupon proceeds were received from the manufacturers. When the risk of loss is not solely borne by one party, but rather generally shared between the parties as evidenced by a fixed payment schedule regardless of when payment is received from a third party, a debtor-creditor relationship is suggested. See In re Telesphere Communications Inc., 205 B.R. at 544. Accordingly, we conclude that as a matter of law a debtor-creditor relationship, rather than a trust relationship, existed between the ShopRite Retailers and CCS.
 
 III.
 
 34
 Even if no agency or trust relationship existed between the ShopRite Retailers and CCS, the ShopRite Retailers contend that Foothill may not assert a valid perfected security interest in the coupon proceeds. At the outset, the ShopRite Retailers claim that Foothill's security interest cannot attach to the coupon proceeds as the proceeds were never CCS's accounts. Section 9106 of the California Commercial Code defines an account as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." Cal.Com.Code § 9106 (West 1990). Any other rights to payment, whether earned or not yet earned, to the extent that they arise other than from goods sold or leased or from services rendered, would not constitute accounts, but general intangibles. See Gordon Car & Truck Rental, Inc. v. American Motors Leasing Corp. (In re Gordon Car & Truck Rental, Inc.), 80 B.R. 12, 15 (N.D.N.Y.1987). As Foothill's financing statement covered both accounts and general intangibles, however, Foothill's security interest is sufficient to cover any rights CCS has in the coupon proceeds.
 
 
 35
 Section 9102 of the Code provides that all transactions intended to create a security interest in accounts and general intangibles, except those excluded under section 9104, are governed by Division 9 of the Code. See Cal.Com.Code § 9102(1)(a) (West 1990). Section 9104(f) of the Code provides that the provisions of Division 9 do not apply to an assignment of accounts for collection purposes only. Id. § 9104(f) (West 1990). Under California law, when an assignment is for collection purposes only, the assignee holds the proceeds of the account in trust for the assignor. See Harrison v. Adams, 20 Cal.2d 646, 128 P.2d 9, 12 (1942). The ShopRite Retailers argue that this exception applies to the assignment of the coupons to CCS. If, however, any purpose other than collection for the assignment exists, the assignment is not exempt from Division 9. See Gold Coast Leasing Co. v. California Carrots, Inc., 93 Cal.App.3d 274, 155 Cal.Rptr. 511, 514 (1979) (assignment for security found not for the purpose of collection only); People ex. rel. Franchise Tax Bd. v. Credit Managers Ass'n., 76 Cal.App.3d 344, 142 Cal.Rptr. 777, 780 (1977) (assignment constituting consideration was not for collection purposes only).
 
 
 36
 In the present case, not only was CCS required to make payment to the ShopRite Retailers on a fixed schedule, whether or not it had received payment from the manufacturers, the transfer of the coupons to CCS was for additional commercial purposes as well, i.e., CCS was required to sort, label, and count the coupons. This arrangement allowed the ShopRite Retailers to receive advances on the coupon proceeds and to enjoy present use of the funds (even if they were later reclaimed by CCS). Accordingly, section 9104(f) does not except the ShopRite Retailers' assignment of the coupons to CCS as the assignment was for purposes other than collection only. We thus conclude that any rights that Foothill asserts in the coupon proceeds are governed by section 9203 of the Code.
 
 
 37
 Under section 9203, we must determine whether Foothill's security interest "attached," and therefore became enforceable. See Cal.Com.Code § 9203(1). Attachment occurs when each of three events has taken place: (1) the secured party has possession of the collateral pursuant to an agreement, or the debtor has signed a security agreement describing the collateral, (2) the secured party has given value, and (3) the debtor has rights in the collateral. Id. § 9203(1)(a)-(c). Although the parties do not dispute that the subsection (a) and (b) of section 9203(1) have been met, they do dispute whether CCS possessed sufficient rights in the coupon proceeds to establish a valid security interest under section 9203(1)(c).
 
 
 38
 As previously noted, Division 9 does not define the term "rights in the collateral." While section 9203(1)(c) does not require that a debtor own or hold title to the collateral, see Merchants Bank v. Atchison (In re Atchison), 832 F.2d 1236, 1239 (11th Cir.1987), mere possession of a collateral by a debtor is not sufficient to constitute "rights in the collateral" under section 9203. See Morton Booth Co. v. Tiara Furniture, Inc., 564 P.2d 210, 214 (Okla.1977). Where a debtor has rights to collateral beyond naked possession, a security interest may attach to such rights. Id.
 
 
 39
 The ShopRite Retailers claim that CCS received at most a security interest or agent's lien securing its fees and any advances. See Restatement (Second) of Agency § 464 cmt. d (1957) (for its "advances to the principal" and its fees, agent has a lien in proceeds and right to reimburse itself for "amounts due from the principal"). The ShopRite Retailers argue that because CCS made no advances with respect to the coupons at issue, CCS could not foreclose on the collateral and its security interest never attached. See Saint Paul Fire & Marine Ins. Co. v. James I. Barnes Constr. Co., 59 Cal.2d 691, 31 Cal.Rptr. 52, 58, 381 P.2d 932, 939 (1963) (if instrument was intended only as security, assignment is a conditional transfer, rather than a present transfer); see also Cal.Com.Code § 9501(1) (West 1990) (default must occur before rights of secured party can be asserted). The ShopRite Retailers claim that it is undisputed that the coupons were not sold to CCS, no permission was given to encumber coupon proceeds, and there was no absolute assignment of all right, title, and interest. Accordingly, the ShopRite Retailers argue that CCS's marginal, tenuous rights are not sufficient to grant a valid, enforceable security interest to Foothill and CCS's sole rights were in its service fee to be deducted from the eight cents handling fee due to the ShopRite Retailers from the manufacturers.
 
 
 40
 The bankruptcy court found that CCS had sufficient rights to the coupon proceeds to allow Foothill's perfected security interest to attach. The court noted that the three different types of Service Agreements either: (1) contained no words of assignment; (2) contained words of assignment; or (3) provided for assignment and hypothecation. The bankruptcy court found that all three types of service agreements transferred rights to CCS that went beyond naked possession, including the rights to receive and retain the coupon proceeds, to commingle the coupon proceeds with its general operating funds, to use the coupon proceeds in its operations and to apply the coupon proceeds to any payments made to the ShopRite Retailers. Accordingly, the bankruptcy court found that Foothill's perfected security interest attached to the coupon proceeds.
 
 
 41
 We agree with the analysis of the bankruptcy court. Both the Service Agreements and the conduct of the parties indicate that CCS had rights in the coupon proceeds beyond mere possession. Moreover, one type of Service Agreement provided CCS with the right to assign and hypothecate the coupon proceeds. See K.N.C. Wholesale, Inc. v. AWMCO, Inc., 56 Cal.App.3d 315, 128 Cal.Rptr. 345, 348 (1976) ("the Commercial Code recognizes that a debtor who does not own collateral may nonetheless use the collateral for security, thereby obtaining 'rights in the collateral,' when authorized to do so by the actual owner of the collateral"). CCS had the sole and exclusive right to the amounts due from the manufacturers pursuant to invoices which so stated on their face. Furthermore, there was no contractual obligation by CCS to segregate the coupon proceeds from its own and thus, CCS could use the coupon proceeds as its general operating funds, indicating that CCS had rights greater than mere possession in the coupon proceeds. Consequently, we find that CCS had sufficient rights in the coupon proceeds to grant Foothill a valid security interest, which properly attached to the coupon proceeds.
 
 CONCLUSION
 
 42
 The orders of the district court vacating the bankruptcy court's order are REVERSED. This matter is REMANDED to the district court with directions to affirm the opinion and order of the bankruptcy court granting Foothill a valid perfected security interest in the coupon proceeds.
 
 
 
 *
 Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 The ShopRite Retailers maintain that there are several disputed facts issues which preclude this court from asserting jurisdiction pursuant to 28 U.S.C. § 158(d). This contention will be discussed infra. The facts outlined here were found to be undisputed by the bankruptcy court
 
 
 [2]
 The coupons generally specified that: (1) they were void if transferred; (2) they were valid only if redeemed by retailers who sold the manufacturer's product; (3) the manufacturer would only honor the coupons in accordance with its coupon redemption policy; and (4) the manufacturer would pay a stated handling fee, typically eight cents per coupon
 
 
 [3]
 At least seven major manufacturers required CCS to enter into Clearinghouse Agreements prior to accepting any coupons from CCS on behalf of retailers. These manufacturers account for approximately 40% of the monies held by the Trustee
 The Clearinghouse Agreements generally provided that CCS would: (1) enter into written agreements with retailers; (2) insure the coupons at all times after the coupons left retailers' possession; (3) separately package the coupons, identify each package with the name and address of each retailer and forward the coupons to the manufacturers with a single invoice in CCS's name; (4) adopt reasonable policies to protect against fraudulent redemptions; (5) promptly reimburse retailers for properly redeemed coupons; (6) allow the manufacturer to audit CCS's records; and (7) acknowledge the manufacturers' right to deal directly with retailers. Several of the Clearinghouse Agreements specifically referred to CCS as the retailers' agent.
 
 
 [4]
 CCS reserved the right to chargeback to the retailers any coupons not redeemed by the manufacturers. The manufacturers could refuse to pay on coupons for a variety of reasons, e.g., the manufacturers would refuse "promotional coupons" without an actual money value or those for which the manufacturer believed the retailer had not actually purchased the product. CCS would also chargeback "slow pay" coupons (those for which the manufacturer did not pay CCS within 30 to 60 days). In such cases, the retailers would have to attempt to collect on the coupons directly from the manufacturers