In re VICTORIA ALLOYS,
INC., Debtor.

Victoria Alloys, Inc., Plaintiff,

v.

Fortis Bank SA/NV, et al., Defendant.

Bankruptcy No. 00–18761.
Adversary No. 01–1045.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

April 10, 2001.

Daniel A. DeMarco, Jean R. Robertson, Hahn Loeser & Parks LLP, Cleveland, OH, for debtor/plaintiff.

Henry C. Shelton III, Armstrong Allen PLLC, Memphis, TN, for Arrow Terminal Company.

R. Timothy Coerdt (# 0007355), Baker & Hostetler LLP, Cleveland, OH, for Arrow Terminal Company.

Charles E. Reynolds, Cincinnati, OH, for River Transportation, a Division of Boswell Oil.

Marvin A. Sicherman, Dettelbach, Sicherman & Baumgart, Cleveland, OH, for Conagra Foods, Inc.

George M. Cheever, Kirkpatrick & Lockhart LLP, Pittsburgh, PA, for Johnston's Port 33, Inc.

Steven J. Reisman, Turner P. Smith, Curtis, Mallet–Prevost, Colt & Mosle LLP, New York City, for Glencore Ltd.

Shawn M. Riley, Anthony J. DeGirolamo, McDonald Hopkins Burke & Haber Co., LPA, Cleveland, OH, for Local Counsel Glencore Ltd.

John W. Read, Julie M. Larson, Vorys, Sater, Seymour and Pease LLP, Cleveland, OH, for Fortis Bank.

Ronald H. Isroff, Michael S. Tucker, Mark E. Porter, Ulmer & Berne LLP, Cleveland, OH, for Victoria Alloys (U.K.) Limited.

### MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

Victoria Alloys, Inc. (the Debtor) seeks the recovery of a certain shipment of pig iron from its parent company, Victoria Alloys, U.K. (VAUK), and other named parties defendant. The principal parties defendant are VAUK (London, England) and VAUK's transaction financier, Fortis Bank (f.k.a. Meespierson Bank, London Branch). Specific relief is sought under Bankruptcy Code §§ 105(a), 541 and 542, and Bankruptcy Rules 7001 and 7065.

Core jurisdiction is acquired under 28 U.S.C. §§ 1334, 158, and General Order No. 84 of this district. The following findings of fact and conclusions of law are rendered following an examination of the evidence adduced at trial and the record generally.

VAUK negotiated a contract with a Swiss raw materials broker, Siglor, S.A. (Siglor), wherein Siglor was to arrange for a quantity of varying grades of Russian manufactured pig iron to be sold to VAUK for an agreed upon price. (D–2.) Pursuant to the bills of lading, delivery was to be made to the port of New Orleans from Tula, Russia on the vessel MV Hanjin Tacoma. (*Id.*) Upon the vessel's arrival in New Orleans, Siglor's agent, Ferro Source, accepted the shipment by presenting a letter of indemnity to the shipmaster. Anticipating the vessel's arrival, the Debtor arranged for logistical support services required to off-load the vessel. (D–13–19.) Those services included the acquisition of stevedores, barges, customs clearance agents, and inspection services. The Debtor then caused the pig iron to be transported by barges to specified warehouse locations within the United States. (Camarati, Direct.) Soon after it sought voluntary relief under Chapter 11, the Debtor prosecuted this adversary proceeding for a determination of ownership.

*Contention of the Parties*

Ownership of the pig iron shipment is disputed between the Debtor, VAUK and Fortis. The Debtor contends that it is the lawful owner of the shipment based upon the terms and conditions of a contract it negotiated with VAUK and certain other related transactional documents and communications. Fortis asserts ownership of the pig iron based upon its possession of the original bills of lading, its security interest in the goods, and the same contract in which the Debtor relies. VAUK,

the Debtor's parent, is supportive of Fortis Bank's asserted ownership of the goods, while further asserting that the Debtor never obtained ownership as a result of the contract it (VAUK) negotiated with the Debtor, since the Debtor never paid for the goods.

*Bankruptcy Estate Property*

■■■ A debtor's bankruptcy estate property is defined under § 541(a) of the Bankruptcy Code [11 U.S.C. § 541(a) ]:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1).

The scope of § 541 is very broad and establishes a bankruptcy estate upon the filing of a bankruptcy petition. As its legislative history reveals, the reach of § 541(a) "will bring everything of value that the debtor has into the estate."[1] Thusly, a debtor's estate property, unless otherwise excepted, is inclusive of both real and personal property interests, both tangible and intangible property interests, as well as property possessed by the debtor or that which is held by others in which the debtor retains an interest. In the latter instance, where a third party holds property in which the debtor has a retained interest, such property is subject to turnover pursuant to § 542 or § 543 of the Code. See, *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309 76 L.Ed.2d 515 (1983).

■■■ Herein, the Court must determine a three-fold issue: (1) Whether the subject pig iron is estate property for purposes of § 541(a)(1);[2] (2) If so, what is the Debtor's interest in that property?; and (3) Did the Debtor possess this property interest as of the petition filing date? Determining what is property under § 541(a)(1) is a question of federal law. *Board of Trade of Chicago v. Johnson,* 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1924) ("Congress derived its power to enact a bankruptcy law from the federal Constitution, and the construction of it is a federal question. Of course, where the bankruptcy law deals with property rights which are regulated by State law, the Federal courts in bankruptcy will follow the State law; but when the language of Congress indicates a policy referring to broader construction of the statute than the state decisions were giving, federal courts cannot be concluded by them." *Id.; accord, Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).)

*Burden of Proof*

■■■ As the Debtor is the party seeking injunctive relief, the burden of proof is on the party who seeks such extraordinary relief. In this contested matter, the Debtor bears that burden which must be borne by clear and convincing evidence. *Meyer Jewelry Co. v. Meyer Holdings, Inc.,* 906 F.Supp. 428, 432 (E.D.Mich.1995). This showing must include: substantial likelihood of success on the merits, irreparable harm to the movant, harm to the movant outweighs harm to the non-movant, and injunctive relief would not violate the public's interest. *In re Wedgewood Realty Group, Ltd.,* 878 F.2d 693, 701 (3d Cir. 1989); *Lobo Enterprises, Inc. v. The Tunnel,* 822 F.2d 331, 333 (2d Cir.1987); *North*

---

**1.** H.R.Rep. 95–595, 95th Cong., 1st Sess. 176 (1977).

**2.** Epstein, D.G., et al., *Bankruptcy,* p. 33, West Pub. Co. (1993).

*Am. Coal Corp. v. Local Union 2262 UMW*, 497 F.2d 459, 465 (6th Cir.1974); *In re First Cent. Finan. Grp.*, 238 B.R. 9 (Bankr.E.D.N.Y.1999). The Debtor also bears the burden of proof on the turnover issue and the avoidance actions. That burden must be met by a preponderance of the evidence. *In re St. Clair Clinic, Inc.*, 73 F.3d 362, 1996 WL 6531 (6th Cir.1996); *In re R.D.F. Devel., Inc.*, 239 B.R. 336, 342 (6th Cir. BAP 1999).

*Bills of Lading Generally*

■ Shipment of the pig iron was made from a Russian port for delivery to New Orleans, Louisiana in August of 2000, pursuant to certain bills of lading. (Miller, Direct.) Section 1–206 of the Uniform Commercial Code (UCC) defines a bill of lading as a document evidencing the receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods. Section 1–201(15) UCC includes a bill of lading among other defined documents of title. In order for a document to be construed as a document of title, it must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.[3] [See also, Carriage of Goods by Sea Act of 1936, Pub.L. No. 74–521, 49 Stat. 1207, 46 U.S.C.A. § 1300 (1975 & Supp.1994).]

The rights and liabilities of parties to bills of lading are typically found under either Article 7 of the UCC, the Federal Bills of Lading Act (FBLA), the Carmack Amendment to the Interstate Commerce Act (Carmack Amendment), or the Carriage of Goods by Sea Act (COGS).[4] The latter applies to ocean bills of lading.

*Negotiable versus Non–Negotiable Receipts*

Whether a receipt is negotiable or non-negotiable is addressed under UCC subsections 7–104(1) and (2). Under § 7–104(1) and (2), a bill of lading is negotiable only if one of two criteria is met: (a) its terms dictate that delivery is to bearer or to the order of a named person; or (b)it runs to a named person or assigns, where recognized in overseas trade. All others are non-negotiable. U.C.C. § 7–104(1) and (2).

Section 7–104 is to be read in conjunction with 7–501 which further addresses the negotiability of documents of title. Section 7–501 provides for the negotiation of a negotiable document of title: (a) upon endorsement and delivery of a document of title running to the order of a named person; or (b) by delivery alone when the terms dictate that it runs to bearer. That section also specifies that the naming of a party to be notified of the arrival of the goods does not constitute notice of any interest in the goods. U.C.C. § 7–501.

*Rights of Purchasers of Bills of Lading:*

Where a carrier issues a bill of lading, it will either be negotiable or non-negotiable. Under Article 7, UCC, a negotiable or "order" bill is one which requires the carrier to deliver to bearer or to the order of a named person. Also, where it is recognized in overseas trading, a bill is negotiable if it runs to a named person or assigns. Any bill not satisfying those definitions is non-negotiable.

Under 7–502 of the UCC, a purchaser negotiating a bill of lading acquires both the title to the document (i.e., bill of lading) and title to the goods. Where the bill is a negotiable type, whatever title to the goods that the bill covers can, generally,

---

3. *White, J.J., et al., Uniform Commercial Code, Fourth Edit., Ch. 29.*

4. The FBLA is not applicable to the present proceeding.

be transferred only by an appropriate transfer of the bill. This raises the issue of "due negotiation" which is also a requirement under Article 7 of the UCC.

*Fortis Bank SA/NV's (Fortis) Continuing Security Agreement Dated October 16, 2000:*

Notedly, this security agreement was executed by VAUK in favor of Fortis Bank. (Fortis–B.) Therein, VAUK granted Fortis a security interest in certain pig iron collateral contained in Schedule A, attached to the security agreement. (*Id.*) The Debtor was not a party on the security agreement. It is also noted that a series of written communications to Ray Zickel from Peter Wilson (of VAUK) sent on September 26, 2000 and September 27, 2000 indicate that the warehousemen confirmed that they were holding "material" on behalf of Fortis Bank of London. (D–71.) Additionally, various finance statements exhibited mention Fortis as being the secured party on the pig iron transaction. (Fortis–B)

*Sales Contract No. 1031.S (Between Debtor and VAUK)*

This sales contract was between VAUK and the Debtor. (D–5; Fortis–C; VAUK–B.) VAUK signed the contract, but the Debtor did not sign. It was dated April 12, 2000. It was a single page contract for the sale of 10,000 metric tons of basic pig iron. This was the same quantity as was contracted between VAUK and Siglor. (D–2.) The shipment origin was Russia, with delivery to New Orleans, Louisiana in two lots at a price of $139.00 per metric ton. The payment terms were succinctly explicit: "Net cash by telegraphic transfer for prompt against presentation of shipping documents to your bank." (D–5; Fortis–C; VAUK–B.)

Upon an examination of the evidence admitted, none of the bills of lading, commercial invoices, warehouse receipts or other documentation exhibited show an ownership interest in the subject pig iron being held by the Debtor. In several instances, various facsimile communications sent by the Debtor to affected warehousemen stated, unequivocally, that certain pig was to properly be shown as pig iron owned by Fortis Bank. (Fortis–H.) Such acknowledgment by the Debtor further instructed the warehousemen not to release any of the Fortis material without clear written instructions from Fortis—and not from the Debtor. (*Id.*) Indeed in several communications issued to Fortis and to the Debtor, the warehousemen, respectively, acknowledged that they were holding pig iron owned by Fortis and would not release same without express written instructions from Fortis. (Fortis–G.) In two such responses, however, the responding warehousemen affirmed material ownership in the name of Fortis but further indicated that the material was being held for the joint accounts of VAUK and for the Debtor. Notwithstanding, materials held for the account of a named entity is not necessarily synonymous with ownership of the items held on account.

On the other hand, the Debtor, who has the burden of proof in this matter, has demonstrated not a single document of title which evinces ownership in its name. Indeed, the Debtor neither had title nor lawful possession of the pig iron. Title vested in Fortis once it acquired the original bills of lading. It is not necessary for this Court to determine which party other than the Debtor owns the material, if it is determined ownership does not lie with the Debtor. The Court is only obliged to determine whether the subject pig iron shipment is estate property pursuant to § 541 of the Code. Herein, the Debtor has failed to prove ownership of the disputed iron. It is further noted that the Debtor was not in privity on either contract of sale which

caused the shipment of the pig iron from Russia to warehouse terminals in the United States. The exhibited contract which the Debtor relies on to establish ownership in the pig iron is unavailing. Firstly, said contract purportedly is between VAUK and the Debtor. (D–5; Fortis–C; VAUK–B.) Nevertheless, only VAUK signed the contract—not the Debtor. (*Id.*) No provision of the contract addresses ownership by Debtor in the pig iron. (*Id.*) Further, the Debtor concedes it never paid for the disputed pig iron to VAUK, Fortis or to anyone. (Wylie, Direct; Stratton, Direct.)

As noted above, the purchaser of a bill of lading, who takes by due negotiation, obtains: (1) the rights possessed by the shipper and (2) title to the document and title to the goods under UCC 7–502, since transfer of the bill of lading is lawfully recognized as the exclusive mode of transferring title not only to the bill of lading, but also to the goods it covers. Effectively, a good faith purchase of a bill of lading who takes by due negotiation under UCC 7–501(4) trumps most all outstanding equities and claims of prior parties both to the bill of lading and to the goods it covers. See, UCC 7–502(2). Purchase of the bill minimizes the risk of a third party successfully acquiring a paramount title. See, *White, et al., supra* at § 28–4, p. 283. Fortis, being the sole possessor of the original bills of lading, fully meets each of these statutory requirements.

The Debtor relies upon Contract No. 1031.S and upon UCC § 2–401 to show ownership of the goods. Assuming, *arguendo*, that ownership of goods is evident from point of shipment, the Debtor's reliance thereon is, again, misplaced. An examination of the contractual language shows that VAUK was obligated to deliver to the Debtor a specified quantity and grade of pig iron, with the Debtor being obligated to pay a sum certain for the goods. (D–5; Fortis–C; VAUK–B.) Nothing of record shows that the Debtor ever paid any amount mentioned under the contract. This finding is undisputed. Nor does the record reflect where the Debtor ever possessed any original document of title pertaining to the goods shipped. This, also, is undisputed. Finally, the parties agreed to contractual terms that clearly create a cash-against-documents transaction, in which the title to the goods was to pass upon the Debtor's payment. (*Id.;* Wilson, Direct.)

*Contract Construction Under the Uniform Commercial Code:*

UCC § 1–102, addressing the legislative purpose of the UCC, indicates that its provisions shall be applied and construed liberally to promote its underlying purposes and policies. Thereunder, the following is noted: UCC § 1–102:

(2) Underlying purposes and policies of this Act are

(a) to simply, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions. UCC § 1–102(1) and (2).

Article Two of the Uniform Commercial Code (UCC) effectively expands the concept of a mutually binding contract. For example, UCC 2–204(1) provides that "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Moreover, UCC §§ 2–206(1) and 2–207(3) also allow for the formation of contracts based in whole or partially on the parties' conduct. Even the formalities for the formation of a binding contract are

relaxed under Article 2 of the UCC. For example, 2–201 (statute of frauds) requires only a writing that indicates a contract was made. Additionally, 2–206 and 2–207 both abandon the requirement that an acceptance must coincide precisely with all terms of the offer. Section 2–204(3) provides:

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness of the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. UCC 2–204(3).

Under UCC–1–201(11), a contract is defined liberally as "the total legal obligation which results from the parties' agreement." Section 1–201(3) defines "agreement" as being "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act." See, *Nanakuli Paving and Rock Co. v. Shell Oil, Inc.* 664 F.2d 772 (9th Cir.1981); *Matter of Swedenborg,* 55 B.R. 820 (Bankr.N.D.Ohio 1985).

Although the UCC was drafted liberally, to provide certain "gap fillers" to allow the existence of a contract where the contractual language in question clearly manifests an intent of the parties to be contractually bound, no provision or gap filler of the UCC is so expansive to provide payment where no payment has been actually made.

Having made no payment for the subject shipment, having no possession of a document of title, and having no possessory interest as of the petition file date, leaves the Debtor with no viable basis for asserting an interest which would inure to the benefit of its bankruptcy estate under § 541 of the Bankruptcy Code. The debtor

had no possessory interest in the goods as they had been reconveyed to Fortis Bank's order prior to the petition filing date. (Fortis–H; Wylie, Direct; S. Zickel, Cross–Exam.)

The Debtor's lack of a legal interest in the pig iron delivered on the Hanjin Tacoma is evident in several ways. Firstly, the Debtor never paid for the shipment, as was required in Sales Contract No. 1031.S. (D–5; Fortis–C; VAUK–B.) Payment on a contract is a significant factor to a claim of ownership of goods. Both the Convention on Contracts for the International Sale of Goods (CCISG) [5] and the Uniform Commercial Code require payment per the contract's terms. The following is required under the CCISG:

*Obligation of the Buyer:*

*Article 53*

The *buyer must pay the price for the goods* and take delivery of them as required by the contract and this Convention.

Section I, *Payment of the Price*

*Article 54*

The buyer's obligation to pay the price includes taking such steps and complying with such formalities as may be required under the contract or any laws and regulations *to enable payment to be made.*

*Article 56*

If the price is fixed according to the weight of goods, in case of doubt it is to be determined by the net weight.

---

5. The U.S. became a signatory to the Convention on August 31, 1981 and became enforce-able after ratification on January 1, 1988. See also, Article 1, CCISG.

*Article 57*

(1) If the buyer is not bound to pay the price at any particular place, *he must pay it to the seller:*

(a) At the sellers place of business; or

(b) *If the payment is to be made against the handing over of the goods or of documents,* at the place where the handing over takes place.

CCISG Arts. 53, 54, 56 and 57. (Emphasis added).

In a similar view, the UCC provides the following:

§ 2–301:

The obligation of the seller is to transfer and deliver, and that of *the buyer is to accept and pay in accordance with the contract* . . .

§ 2–511(1):

*Unless otherwise agreed, tender of payment is a condition to the seller's duty to tender and complete an delivery.* (Emphasis added).

*Injunctive Relief:*

The evidence adduced clearly shows an absence of title ownership of the shipped goods reposed in the Debtor and, as such, further injunctive relief is not warranted against the parties defendant for the following reasons: 1) No document was exhibited by the Debtor that reveals the Debtor held title to the shipped pig iron; 2) The contract between VAUK and the Debtor for the sale of the subject pig iron was not only not executed by the Debtor, the Debtor concedes that it never paid for the pig iron; 3) Even the Debtor's former employee who arranged the logistical support for the off-loading, delivery, and warehousing of the material did so upon an "assumption" that the Debtor owned the material (Camarati, Direct/Cross–Exam.); 4) The Debtor's former head employee, Ray Zickel, not only was not familiar with the particulars of the unexecuted contract between the Debtor and VAUK, he also testified, unequivocally, that he did not instruct Sandra Camarati to process the subject pig iron for delivery to a warehouse (R. Zickel, Cross–Exam). This is significant, as Ray Zickel is the only employee of the Debtor who could contractually bind the Debtor. (*Id.*)

*Contract Between Victoria Alloys (VAUK), Ltd. and Siglor S.A. of Switzerland (The Seller's Contract) (Exh. 1)*

*The Contracts*

Pursuant to terms of a contract executed on March 9, 2000 between Siglor and VAUK, Siglor agreed to sell VAUK 10,000 MT of basic pig iron for a specified price. (D–2.) Among other terms and conditions: (1) The date of delivery was considered to be the date of the bill of lading; (2) The shipment was to be shipped from a Russian manufacturer by a Russian carrier to a port in Louisiana; (3) The documents were to be presented, ". . . direct to the buyer's (VAUK's) bank" (i.e., Fortis). (*Id.*) Among the documents to be presented to VAUK's bank was a full set of original bills of lading. Delivery was to be made in two lots during April/May of 2000 to the port of New Orleans, Louisiana, USA. (*Id.*)

The contract between the Debtor and VAUK embodies the terms and conditions for the pig iron to be sold to the Debtor. (D–5; Fortis–C; VAUK–B.) The contract, *inter alia*, identifies the product, quality, size, quantity, origin, packing, delivery, price, and payment terms for the pig iron. It also specifies that the port of New Orleans, Louisiana is the delivery point. Although delivery was to occur in two lots during the months of April/May, 2000, it is undisputed that the shipment was not delivered until August of 2000. (Camarati, Direct.) The shipment's unloading at the delivery point was negotiat-

ed by Ferro Source, Inc., an agent of Siglor, S.A. of Switzerland, the originating seller. (Miller, Direct.) Rather than a presentment by Ferro Source of the relevant bills of lading to the vessel's ship master, a letter of indemnity was presented to effectuate the unloading of the ship in New Orleans. (*Id.*) The original bills of lading were and remain in the possession of Defendant Fortis Bank.

The payment terms for the shipment were:

Net cash by telegraphic transfer for prompt against presentation of shipping documents to your bank. (Sales Contract No. 1031.S, D–5; Fortis–C; VAUK–B.)

This sales contract was dated April 12, 2000 and was signed only by an official of VAUK. No one signed on behalf of the Debtor.[6] In furtherance of said contract, VAUK caused a facsimile message to be sent to the Debtor dated August 9, 2000, attention Sandra Camarati, which contained a copy of the original bill of lading (D–10). Notwithstanding the contract's payment terms, the following is undisputed: (1) The Debtor never paid for the pig iron shipment; (2) The Debtor never possessed or presented the shipment's original bills of lading; (3) The Debtor did not negotiate the delivery of the material's arrival by presenting any documents of title nor did the Debtor present a letter of indemnity to accept delivery. Indeed, the delivery acceptance was negotiated by the originating shipper's agent with a letter of indemnity—not by the Debtor or by any agent of the Debtor.

*Course of Dealing*

The testimony of Sam Zickel, a former senior officer of the Debtor, revealed the

usual course of dealing for the Debtor to acquire pig iron and other ferrous metals and alloys for use in its business. (S. Zickel, Direct/Cross–Exam.) Usually, the Debtor would negotiate its purchase of Russian pig iron directly with Siglor, S.A. or with Siglor's agents. (*Id.*) Siglor and its agents represented the Russian producer of the pig iron, JSC Tulachermet of Tula, Russia. As a result of the Debtor's blemished payment history, Siglor refused to continue doing business directly with the Debtor. (*Id.*) That occurrence resulted in the parent company, VAUK contracting directly with Siglor for the pig iron, for further resell to the Debtor. In this regard, the subject pig iron was sold by Siglor to VAUK pursuant to their contract of February 11, 2000. (D–2.) However, there was no subsequent sale of the pig iron to Debtor since the Debtor never paid for it.

*Alleged Preferential Transfer*

■ The Debtor alleges that its prepetition transfer of pig iron to Fortis' account was made preferentially and is thereby voidable. Section 547(b) of the Bankruptcy Code provides the required elements for an avoidable preference. Therein, the following is noted:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or (B)

---

**6.** It is undisputed that this unusual practice was the usual course of dealing between VAUK and the Debtor.

between ninety days an done year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provision of this title.

11 U.S.C. § 547(b).

 The initial inquiry must determine that a prepetition transfer was made which involved an interest of the Debtor or the Debtor's estate. As determined herein, the Debtor never acquired ownership of the subject pig iron. It never possessed legal title to the goods and never paid for it. At best, the Debtor had only a brief, albeit wrongful, transitory possessory interest as a result of its own appropriation of goods legally owned by Fortis (or owned by VAUK, subject to Fortis' security interest.). A misdirection of another's goods does not repose title ownership in the party who perpetuated the misdirection. Thusly, no voidable preferential transfer is found. Such a possessory interest is not an interest of the debtor in property, as required under § 547(b). See, *In re Hartley*, 825 F.2d 1067 (6th Cir.1987) ("Funds loaned to a debtor that are earmarked for a particular creditor do not belong to the debtor because he does not control them"); *In re Sanders*, 213 B.R. 324 (Bankr. M.D.Tenn.1997). The fundamental inquiry is whether the transfer diminished or depleted the debtor's estate. "Generally, a transfer of money or property owned by a third person to a creditor of a debtor is not a preference." 5 *Collier on Bankruptcy*, ¶ 547.03[2]. Herein, the subject pig iron was never a part of the Debtor's estate. Thusly, it was not part of a fund to which the Debtor's creditors could resort.

The Debtor also alleges a preference action on two further bases. First, it asserts that a portion of the pig iron that it transferred to Fortis belonged to the Debtor, and was transferred to compensate for portions of the Hanjin Tacoma pig iron which had already been sold. Second, the Debtor contends that it transferred to Fortis a greater amount of pig iron than the amount owed; any overage, it argues, should constitute a preference. The transfer to Fortis, however, was nothing more than an effort to restore a fungible amount of pig iron to its rightful owner, not a transfer of the Debtor's interest. Beyond that, there is no support in the record that the Debtor reconveyed to Fortis any more pig iron than it had wrongfully possessed.

*Alleged Fraudulent Transfer:*

 The Debtor also alleges that its transfer of the pig iron to Fortis' account constituted an avoidable fraudulent transfer. That allegation, too, is without support in the record, and is thereby without merit. The required elements for an avoidable fraudulent transfer are set forth in § 548 of the Code. Therein, the following is noted:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1).

As noted, such relief can be obtained only where an interest of the Debtor was transferred within the proscribed time period prepetition. As determined above, the Debtor never acquired the qualifying type of interest contemplated for prosecution under § 548. As such, the remaining elements under § 548 do not warrant further addressment by the Court. Thusly, the Debtor fails to maintain a viable action for recovery under § 548.

Lastly, the Debtor seeks recovery of the pig iron under the Court's equitable powers provided under § 105 of the Code. Relief on that basis is also unavailing herein. In the alternative to its turnover and avoidance claims, the Debtor seeks a permanent injunction under § 105 of the Bankruptcy Code. Section 105 provides, in pertinent part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Notwithstanding, this Court's equity jurisdiction is not without limitations. "Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Therefore, the power of the Court to invoke § 105(a) is restricted to instances in which no provision of title 11 dictates an inconsistent result. *Architectural Bldg. Components v. McClarty (In re Foremost Mfg. Co.)*, 137 F.3d 919, 924 (6th Cir.1998); *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 830 (1st Cir.1990); *Bear v. Coben (In re Golden Plan of California, Inc.)*, 829 F.2d 705 (9th Cir.1986). In the present case, the remedies sought by the Debtor are addressed squarely by provisions of the Bankruptcy Code. Under the facts of this proceeding, to allow a permanent injunction while disallowing the claims asserted at law would far exceed this Court's equity jurisdiction.

Moreover, even if no countervailing provisions existed under the Bankruptcy Code, the Court would still need to determine whether the equitable relief sought by the Debtor was traditionally accorded by courts of equity. "The equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–319, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). The relief sought in this case was not of the variety over which an eighteenth century chancery court of equity would have presided. *See, e.g.,* 3 Pomeroy, *Pomeroy's Equity Jurisprudence* (5th ed.1941). Therefore, even if the Court was empowered to grant equitable remedies under § 105(a), it would not possess the equity jurisdiction to do so in this particular in-

stance. Lastly, "turnover is not intended as a remedy to determine the disputed rights of parties to property; rather, it is intended as the remedy to obtain what is acknowledged to be property of the bankruptcy estate." *In re Rosenzweig*, 245 B.R. 836 (Bankr.N.D.Ill.2000); *Marlow v. Oakland Gin Co., Inc. (In re Julien Co.)*, 128 B.R. 987, 993 (Bankr.W.D.Tenn.1991), *aff'd.*, 44 F.3d 426 (6th Cir.1995). The court in *Rosenzweig* also opined "that if the debtor does not have the right to possess or use the property at the commencement of a case, a turnover action cannot be used to acquire such rights." *Rosenzweig, supra* at 840.

### Conclusion

Accordingly, judgment is hereby rendered in favor of the parties Defendant, and the Complaint is hereby dismissed. Each party is to bear its respective costs.

IT IS SO ORDERED.

### *JUDGMENT*

A Memorandum Of Opinion And Order having been rendered by the Court in these proceedings,

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of the parties Defendant, and the Complaint is hereby dismissed. Each party is to bear its respective costs.